UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――

DENISE PIECHOWICZ, Individually and as
Administratrix of the Estate of J. P., Deceased

Plaintiff

vs.

LANCASTER CENTRAL SCHOOL DISTRICT
PETER F. KRUSZYNSKI

Defendants

―――――――――――――――――――――――――――――――

**AMENDED
COMPLAINT**
**Index # 17-cv-845**

Plaintiff, Denise Piechowicz Individually and on behalf of J. P.; Denise Piechowicz, as

duly appointed Administratrix of the Estate of J. P., as and for her Amended Complaint against

Defendants, Lancaster Central School District and Peter F. Kruszynski.

## PRELIMINARY STATEMENT

1.      This Complaint for personal injuries, deprivation of rights, and wrongful death is

brought under the common law of New York, the Constitutions of the United States and State of

New York; N.Y. Estate Powers & Trust Law § 5-4.1; the Civil Rights Law of 1871, 42 U.S.C. §

1983, *et seq.*; the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"); the

Rehabilitation Act of 1973, 29 U.S.C. § 701 ("Rehabilitation Act"); and N.Y. Civil Rights Law §

79-n.

## PARTIES

2.      Plaintiff, Denise Piechowicz is a natural person and resident of the State of New York, County of Erie. She is the mother of the late J. P.

3.      Plaintiff, Denise Piechowicz was appointed Administratrix of the Estate of J. P., by the Surrogates Court of the State of New York in and for the County of Erie, on May 26, 2016.

4.      At all times relevant hereto, Plaintiff J. P., was a natural born person and resident of the State of New York, County of Erie. Plaintiff, J. P. was born on XXXX XX, 2002, and died on May 6, 2016.

5.      Defendant, Lancaster Central School District ("School District"), a recipient of federal financial assistance, is a school district duly organized and existing under the laws of the State of New York and maintains a principal place of business in the County of Erie, State of New York.

6.      At all times relevant hereto, Defendant Peter F. Kruszynski, was the Principal of the Lancaster Central Middle School. He is sued in both his individual and official capacity.

## CONDITIONS PRECEDENT

7.      On or about August 2, 2016, a Notice of Claim was duly served on Defendant, Lancaster Central School District. A General Municipal Law Section 50(h) examination was conducted on October 13, 2016. At least 30 Days has elapsed since the service of said Notice of Claim and payment thereon has been neglected.

8.      Plaintiff expressly references and incorporates the transcript from said General Municipal Law Section 50(h) hearing, and references the factual statements made therein.  A redacted version is attached hereto as **Exhibit A** of the Amended Complaint.

9.      Plaintiff also expressly references and incorporates the Lancaster Central School District Code of Conduct, which was in effect prior to and as of 2016.  It is attached hereto as **Exhibit B** of the Amended Complaint.

## FACTS

10.     The incidents giving rise to this action during the 2015-2016 school year, at the Lancaster Middle School while the Plaintiff's  decedent, J. P., was a student at the Lancaster Central School District in the Lancaster Middle School, Town of Lancaster, County of Erie, and State of New York.

11.     During the 2015 to 2016 academic year and before, Plaintiff's decedent, J. P., was a Special Education student at Lancaster Central Middle School.

12.     J. P. suffered from disabilities that affected his learning during his academic career.

13.     At all relevant times, J.P. had a special relationship with the defendants.

14.     J. P. disabilities included but were not limited to a long-diagnosed Central Auditory Processing Disorder and other learning disabilities.

15.     These disabilities substantially limited the ability of J.P. to perform the major life activities of speaking, learning, reading, concentrating, thinking, and communicating.  These disabilities also limited his ability to comprehend, process, and retain information, further

substantially limited his ability to communicate in that he had a long-existing inability to recognize communicated emotions and a frequent misunderstanding of social cues.

16.     According to a Psychoeducational Evaluation done by the Defendant, Lancaster Central School District, the above-mentioned disabilities, along with their limitations on the above-mentioned major life activities, impacted J. P. to such an extent that special education services were required and were provided over many years.

17.     At all times relevant hereto, J. P. was disabled within the meaning of the ADA and Rehabilitation Act and received services for individuals qualified under those Acts.

18.     J.P.'s disability was known to the Lancaster Central School District and to Defendant Peter F. Kruszynski

19.     At the time of his death and prior thereto, J.P. was attending the Lancaster Central Middle School.

20.     While attending the Lancaster Central Middle School, J. P. was subjected to continuing, recurring and unremedied harassment by school employees, and/or administrators, including Defendant Peter F. Kruszynski, because of J.P.'s disabilities.

21.     Upon information and belief, this harassment included, but was not limited to, intentionally disregarding J.P.'s individual education plan, and interrogating J.P. with knowledge that J.P.'s auditory processing disorder made the interaction incomprehensible and unpleasant to J.P.

22.     From on or about March 2016 through May 6, 2016, J. P. was negligently and/or intentionally subjected to inappropriate and illegal deprivations of due process, namely two

suspensions in violation of New York educational law and/or federal law and in violation of the Lancaster School Districts policies.

23.     J.P. was not afforded a hearing or the minimal due process to which he was entitled either before or after a March 2016 suspension.

24.     From early 2016 through May 6, 2016, J. P. also was subjected to negligent, harassing, threating and illegal interrogation and illegal searches and seizures of J. P.'s person and property.  All of the foregoing caused severe emotional distress, embarrassment, intimidation, fear, shame, and scorn, which caused or contributed to and led to his death.

25.     On or about May 6, 2016, Defendant Peter F. Kruszynski, improperly and negligently interrogated J.P. During this meeting Defendant Peter F. Kruszynski made false statements, harassed, bullied, and intimidated J. P. and secured participation of a police officer with the sole purpose of improperly intimidating and harassing J. P.  Upon information and belief, the interrogation included accusing J.P. of criminal conduct, including, but not limited to, falsely accusing J.P. of the criminal possession, promotion, or distribution of child pornography.

26.     Peter Kruszynski knew or should have known that the May 6, 2016, interrogation could not be comprehended by J.P.  Defendant Kruszynski was aware of J.P.'s disability, and the effect that J.P.'s auditory processing disorder made J.P.'s unable to comprehend the interrogation. Principal Kruszyski continued the interrogation in a manner that bullied, isolated, and harassed J.P., who, because of his auditory processing disorder, could not process the interaction with Principal Kruszynski in the same manner that a non-disabled student could.  Kruszynski was aware

of this, and nevertheless intentionally continued to interrogate and to bully the disabled student, J.P.

27. Upon information and belief, Principal Kruszynski, acting in the course and scope of his work with the Lancaster Central School District, so interrogated J.P. because a female student took inappropriate nude or partially nude photograph(s) of herself and then shared said photograph(s) with other students within the Lancaster Central School District. When the existence of the photograph(s) became known among the students and/or distributed among the students, the female student complained to Principal Kruszynski.

28. The complaints of the female student created a perceived problem for Principal Kruszynski and for the Lancaster Central School District.

29. Rather than investigate the allegations in accordance with State and Federal educational, criminal procedural, and constitutional law, Principal Kruszynski violated said policies and laws in an attempt to expediently resolve what he perceived to be a problem. J.P. was vulnerable to such questioning because of his auditory processing disorder, which impacted his ability to comprehend verbal information and resulted in J.P. experiencing intimidation and bullying by the principal.

30. Principal Kruszynski detained J.P. in the presence of, and in the custody of, a policy officer as part of his investigation into the inappropriate photograph.

31. Upon information and belief, Principal Kruszynski questioned J.P. without a parent, guardian, or representative present. Upon information and belief, this questioning violated school

district policy and state and federal education law, including the IDEA and Article 89 of the New York Education Law.

32.     Upon information and belief, Principal Kruszynski engaged the school's resource officer, a uniformed police officer, to interrogate J.P.

33.     The invocation of the school resource officer to interrogate J.P. constituted a referral to law enforcement.

34.     Neither the defendant Kruszynski, nor the Lancaster School Districtb provided copies of J.P.'s special education and/or disciplinary records to law enforcement before referring J.P. to law enforcement.

35.     Defendant Kruszynski's and Lancaster School District's conduct in referring J.P. to law enforcement violated state and federal law, including, but not limited to 20 U.S.C. §1415(k)(6) and 34 CFR § 300.535.

36.     The referral to the police officer and the detention of J.P. violated the Lancaster School District's Code of Conduct.

37.     These state and federal protections for special education students, demand the provision of special education and disciplinary records before the invocation of law enforcement, such as a School Resource Officer,

38.     Upon information and belief, J.P. was seized and was in custody at the time of the interrogation(s) within the meaning of the Fourth Amendment of the U.S. Constitution.

39.    Upon information and belief, J.P. was not meaningfully or adequately apprised of his rights under federal, state, and constitutional law to remain silent, to a hearing, and to be represented in connection with any interrogation or hearing.

40.    Upon information and belief, J.P. was not meaningfully or adequately apprised of his rights to have a parent present in connection with any interrogation or hearing.

41.    J.P. was not informed of his constitutional rights, and was not properly *Mirandized*, prior to the interrogation.

42.    Official policy of the Lancaster Central School District that was in effect in 2016, set forth in the relevant "Code of Conduct" authorized Student Searches and Interrogations in a manner that violated the U.S. Constitution and federal and state law.  Specifically, the Code of Conduct provided, "Any school designee authorized to impose a disciplinary penalty on a student may question a student about an alleged violation of law, school rules or the District Code of Conduct.  School officials are not required to give a 'Miranda' type warning before questioning, nor are school officials required to contact a student's parent before questioning the student. However, school officials will tell all students why they are being questioned . . . . School officials have the right and responsibility to contact appropriate law enforcement agencies, as may be necessary, with regard to statements and information given by students to school officials."

43.    The official Interrogation and Search policies of the Lancaster Central School District violated Fourth Amendment precedent that was well established prior to and as of 2016.

44.     Upon information and belief, Principal Kruszynski and other agents of the Lancaster School District searched J.P.'s telephone without obtaining a warrant, without reasonable suspicion, and without any basis or exception to the warrant requirement.

45.     The need for a warrant and/or reasonable suspicion was clearly established law at the time, and the search was unreasonable and illegal under clearly established state and federal law.

46.     As a result of defendants' negligence, recklessness, deliberately indifferent, and/or unlawful conduct, J.P. sustained serious emotional harm and suffering which includes, but is not limited to, shame, scorn, intimidation, embarrassment, degradation, and fear all of which caused his death; and his surviving distributes have sustained pecuniary injuries.

47.     Principal Kruszynski and the Lancaster Central School District had knowledge of J.P.'s disability at all relevant times herein.

48.     Principal Kruszynski and the Lancaster Central School District again suspended J.P. on May 6, 2016, which was his second suspension of the school year.

49.     Upon information and belief, the May 6, 2016, suspension lacked all basis under State Educational law and the Lancaster Central School District's Code of Conduct and was thus unlawful.

50.     Principal Kruszynski and the Lancaster Central School District knew or should have known that by seizing J.P., interrogating J.P., isolating J.P., coercing a search of J.P.'s person and property, they were placing at J.P. at risk of self harm or suicide.

51.    Upon Information and belief, Principal Kruszynski and the Lancaster Central School District knew J.P.'s Individual Educational Plan and the effects that J.P.'s auditory processing disability had on his ability to comprehend verbal information.  The defendants knew or should have known that J.P.'s auditory processing disorder rendered J.P. incapable of comprehending verbal information in the same manner that a non-disabled student would, leading J.P. to be confused and more sensitive to verbal information and more likely to be intimidated by verbal confrontation.

52.    Upon information and belief, Principal Kruszynski and the Lancaster Central School District knew or should have known that J.P. was confused by and exceptionally intimidated by verbal reprimand, which he was incapable of fully understanding, creating a risk of harm to J.P.

53.    The defendants were negligent, grossly negligent, reckless and/or deliberately indifferent in the following ways:

- Making False Statements to J. P.

- Threatening J.P. with penalty or sanction.  Upon information and belief, this included threatening J.P. with criminal penalties and accusing J.P. of having committed crimes of moral turpitude, including, but not limited to, possessing, or promoting, or distributing child pornography.  Upon information and belief, the principal knew or should have known that these allegations were outrageous and ill founded, but made them to intimidate and to bully J.P.;

- Threatening J.P. with other criminal sanctions, including other felonies;

- Threatening J.P. with expulsion from school;

- Publicly shaming J.P. in front of other students;

- Failing to *Mirandize* J.P. before interrogating him;

- Willfully promulgating and/or continuing a policy or custom after 2011 that violated *J.D.B. v. North Carolina*, and ignored the Fourth Amendment rights of students;

- Denying J.P. a hearing before or after the March 2016 suspension;

- Failing to apprise J.P. or his parents of their rights to a hearing following the March 2016 suspension;

- Denying J.P. a hearing before or after the May 6, 2016 suspension;

- Failing to advise J.P. of his rights to have a parent or guardian present before interrogating him;

- Conducting an illegal warrantless, suspicionless search;

- Utilizing school resources and law enforcement officers to investigate conduct that occurred off premises;

- Punishing J.P. at school for conduct that occurred off school premises;

- Failing to properly train, supervise, and discipline employees, including Principal Kruszynzki;

- Promulgating a policy or custom which provides for and/or tolerates the commission of unconstitutional and tortious acts by its employees and/or administrators by incorrectly instructing school staff, including Principal Kruszynzki on applicable state and federal law;

- The district's own Code of Conduct expressly provided that the district was not responsible for inappropriate content or material accessed via personal technology owned by the student. Despite this Code of Conduct, the Principal Kruszynski expressly violated the district's technology provisions and conducted searches of J.P.'s personal technology for information or content that was provided off-premises.

- Neither the district nor Principal Kruszynski referred J.P. to the Committee on Special Education and discipline before suspending J.P. on two separate occasions in 2016. This directly violated the school district's own Code of Conduct and state and federal educational law.

- Failing to appropriately discipline employees and/or administrators who commit unlawful and/or negligent acts done under color of law within the scope of their authority as public employees, principal, and superintendent;

- Failing to establish and act upon adequate policies, procedures and systems for reporting and investigating and correcting incidents of bullying and harassment so as to protect student victims of these acts by administrators;

- Failing to follow school district policies and procedures;

- Failing to comply with State Education Law;

- Failing to comply with federal statutory and constitutional law guiding investigations, searches, and seizures;

- Failing to have a parent, representative, or attorney present before questioning J.P;

- Failing to obtain a warrant before conducting a search of J.P.'s person;

- Continued to commit acts of cruelty toward J. P.;

- failing to establish a process for student interview and discipline in conformity with existing state and federal laws;

- failing to appropriately train, supervise, monitor and detect the contact between the Plaintiff's decedent and Respondents' employees;

- failing to promulgate and follow proper protocol and procedure for student interaction with district personnel;

- failing to disclose such information to appropriate personnel, and upon discovering same to the infant decedent's parents, further causing damage to the infant decedent; and

- failing to properly investigate the situation upon notification thereby subjecting the infant decedent to extensive, intimidating, embarrassing, harassing, illegal, irrelevant, and unauthorized questioning — without representation of a parent or counsel — all causing further extreme emotional distress, fear, pain and suffering.

54. Furthermore, the Defendant Lancaster Central School District was negligent in failing to properly supervise the Plaintiff's decedent and such negligence caused the aforesaid injuries and resulting death.

55. Additionally, the Defendants, respective servants, and/or employees were negligent in allowing individuals to circumvent or thwart the appropriate and customary protocol, policies and rules to protect J. P. from such actions.

56. The nature and full extent of said injuries are ongoing and include such things as:

    a. Financial loss;

b.  Wrongful death;

c.  Fear of death;

d.  Pain and suffering;

e.  Physical harm;

f.  Emotional distress, mental anxiety, depression, and psychological trauma;

g.  Deprivation of companionship and loss of consortium;

h.  Humiliation, indignity, and shame;

i.  Loss of enjoyment of life;

j.  Harm and injury to family and community relations;

k.  Legal fees and expenses;

l.  Deprivation of human, civil, and constitutional rights in violation of laws and constitutions of the United States and the State of New York; and

m.  Plaintiffs may have otherwise been damaged.

Damages stated above are only those known at this time, future economic, emotional and physical and other non-pecuniary damages are unknown.

## AS AND FOR A FIRST CAUSE OF ACTION, AS FOR DENISE PIECHOWICZ FOR WRONGFUL DEATH

57.    Plaintiff  repeats and re-alleges each and every allegation set forth in paragraphs 1 through 56 above.

58. The deliberate, reckless and/or negligent acts of the Defendants, as set forth above, both individually and in concert served to proximately caused J. P. undue stress, anxiety, strain, embarrassment and humiliation such that he committed suicide, as a direct result thereof.

59. Although the death occurred off school premises, all relevant conduct of Principal Kruszynski and the Lancaster Central School District occurred on school premises and in violation of the duties owed to J.P. by the defendants to a student.

60. J. P.'s death was caused by the wrongful acts and omissions of the Defendants herein, and were a foreseeable consequence of such acts and omissions.

61. As a result of said wrongful death, Plaintiffs and Plaintiffs decedent are entitled to receive damages for pain and suffering, loss of companionship as well as expected lifetime earnings, benefits, and other benefits which would have been received but for the acts of the Defendants as set forth above.

## AS AND FOR A SECOND CAUSE OF ACTION, FOR NEGLIGENCE

62. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 61 of this Amended Complaint.

63. Defendants owed J. P. a duty to provide a safe learning environment free from harassment and bullying.

64.     Defendants failed to act in *locus parentis* or take appropriate action to protect one of their students, J. P., through enforcing the policies of bullying and harassment of J.P. and/or adopting new policies.

65.     Defendants failed to establish and act upon adequate policies, procedures and systems for reporting, investigations and correcting incidents of bullying, hate crimes, and harassment so as to protect student victims of these acts by others.

66.     Defendant Kruszynski breached his statutory and regulatory duties owed to the plaintiff, including, but not limited to, the duty to provide law enforcement with information regarding a disabled student prior to involving law enforcement in an investigation.

67.     Defendants condoned and tacitly approved the harassment and bullying and disparate treatment of J.P.

68.     Defendants failed to discipline appropriately employees who have committed illegal or negligent acts done under color of law and within the scope of their authority as public employees or principal.

69.     Defendants promulgated a policy and/or custom which provides for and/or tolerates bullying and harassment by its employees.  This included establishing official policies that deprived students of Fourth Amendment protections.

70.     Defendants, in breach of their duty of care, negligently investigated, detained, searched, and punished J.P., causing him injury and suffering.

71.     Defendants breached their duty of care for questioning, disciplining, and searching J.P., a student to have a known disability.

72.     Defendant Lancaster Central School District negligently and improperly trained, supervised and failed to discipline its employees, including Principal Kruszynski. This negligence included, but is not limited to, the failure to train employees on interrogations, adjudications, and searches.

73.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Plaintiffs decedent have suffered injury and harm and are entitled to compensation therefor.

## AS AND FOR A THIRD CAUSE OF ACTION, FOR GROSS NEGLIGENCE

74.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 73 of this Amended Complaint.

75.     Defendants failed to act in *locus parentis* or take appropriate action to protect J. P. even with both actual and constructive notice of his victimization and disability.

76.     Defendants failed to establish and act upon adequate policies, procedures and systems for reporting, investigating and correcting incidents of bullying, hate crimes, and harassment so as to protect student victims.

77.     Defendants condoned and tacitly approved the harassment and bullying by itself disparately treating J.P.

78.     Defendants willfully deprived J.P. of rights protected by state, federal and constitutional law, and subjected J.P. to unlawful interrogation and searches.

79.     Defendants baselessly threated J.P., whom they knew to be vulnerable, with criminal penalty unless he falsely admitted to criminal conduct in which he had not engaged.

80.    Defendants promulgated a policy and/or custom which provides for and/or tolerates bullying and harassment and the deprivation of statutory and constitution rights.

81.    Defendants failed to properly train, supervise and discipline its employees.

82.    Defendants failed to take any and all appropriate steps to protect J.P., after having learned of the need to do so, all the time being aware that specific other named students posed a clear and present danger, and negligence of employees towards J.P.

83.    Defendants' acts and omission were so wanton, reckless, and indifferent as to constitute gross negligence.

84.    As a direct proximate result of Defendants gross negligence, Plaintiffs and Plaintiffs decedent have suffered injury and harm and are entitled to compensation therefor.


## AS AND FOR A FOURTH CAUSE OF ACTION,
## AS FOR J. P. UNDER THE FOURTEENTH AMENDMENT
## TO THE UNITED STATES CONSTITUTION VIA 42U.S.C. § 1983

85.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 84 as if fully set forth herein.

86.    At all times relevant hereto, J. P. and Defendants Lancaster Central School District and its employees, and agents had a special relationship whereby Defendants had a constitutional duty to protect J. P. Alternatively, said Defendants exposed J. P. to danger implicitly and explicitly committing, condoning or allowing acts of bullying against J. P., and subjecting him to discipline and otherwise treating him disparately as to other students/

instigators and allowing faculty to speak negatively about J.P. in the presence of J.P., other students, and to his parents.

87.     Defendants were deliberately and or/ recklessly indifferent to the continuous bullying, harassment and discrimination against J. P. thereby breaching their constitutional duty.

88.     Defendants ignored federal statutes and well-established constitutional jurisprudence, depriving J.P. of liberty and property interests via unlawful searches, seizures, and adjudications.

89.     Defendant Peter F. Kruszynski, was acting under the color of New York State Law, and denied and deprived J. P. of the rights and privileges protected by federal law and the U.S. Constitution to J. P.'s injury, detriment, and death.

90.     Defendant LANCASTER CENTRAL SCHOOL DISTRICT was a person acting through official policies, practices, or customs, and under color of law of the State of New York, when it denied and deprived J.P. of the rights and privileges protected by federal law and the U.S. Constitution to J. P.'s injury, detriment, and death.  This included an official policy of denying all *Miranda* protections to students, despite clear binding precedent to the contrary.

91.     As a direct and proximate cause of the Defendants' aforementioned unconstitutional acts and omissions, Plaintiff and Plaintiff's decedent have been injured and harmed and are entitled to compensation therefor.

92.     Plaintiff and Plaintiff's decedent are entitled to attorney's fees, and make claim to attorneys fees, pursuant to federal statute, to wit, 42 U.S.C. § 1988.

**AS AND FOR A FIFTH CAUSE OF ACTION,
AS FOR J.P. UNDER THE NEW YORK CONSTITUTION**

93.     Plaintiff repeats and re-alleges each and every allegation set for in paragraph 1 through 92 as if fully set forth herein.

94.     At all times relevant hereto, J. P. and defendants Lancaster Central School District and its employees, and agents had a special relationship whereby Defendants had a constitutional duty to protect J. P.

95.     Alternatively, said Defendants exposed J. P. to danger by implicitly and explicitly condoning or allowing acts of bullying against J. P., and subjecting him to discipline and otherwise treating him disparately as to other students/instigators and allowing faculty to speak negatively about J. P. in the presence of J.P., other students, and to his parents.

96.     Defendants were deliberately and/or recklessly indifferent to the continuous bullying, harassment and discrimination against J. P. thereby breaching their constitutional duty under article I, Section 6 of the New York Constitution.

97.     As a direct and proximate cause of Defendants' aforementioned unconstitutional acts and omissions, Plaintiff and Plaintiff decedent have been injured and harmed and are entitled to compensation therefor.

**AS AND FOR A SIXTH CAUSE OF ACTION,
AS FOR J.P. UNDER THE NEW YORK CONSTITUTION**

98.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 97 as if fully set forth herein.

99.     At all times relevant hereto, J. P. was a member of a class of persons suffering from disabilities.

100.    J. P. was discriminated against on the basis of disability and treated disparately in comparison to students outside the class of persons suffering from disabilities and said disparate treatment was, upon information and belief, intentional and based on his disabilities.

101.    *Inter alia,* Defendants caused and failed to take action to protect J. P. from bullying, harassment and discrimination because of his disabilities as well as themselves engaged in discrimination because of his disabilities.

102.    As a direct proximate cause of Defendants' aforementioned unconstitutional acts and omissions, in violation of Article I, Section 11 of the New York Constitution, Plaintiff and Plaintiff's decedent have been injured and harmed and is entitled to compensation therefor.

## AS AND FOR A SEVENTH CAUSE OF ACTION, AS FOR J.P.  AND DENISE PIECHOWICZ UNDER THE ADA

103.    Plaintiff repeat and re-alleges each and every allegation set forth in paragraph 1 through 102 as if fully set forth herein.

104.    At all times relevant hereto, J. P. was an individual with a disability under the ADA.

105.    At all times relevant hereto, Defendant Lancaster Central School District was a public entity covered under Title II of the ADA.

106.    Defendant Lancaster Central School District violated Title II of the ADA in that J. P. was subjected to discrimination based on his disabilities while enrolled and attending school at

said School District and/or suffered from policies, practices, and/or procedures which had discriminatory effect.

107.    Upon information and belief, J.P. was suspended, twice, by the defendants in whole or in part because of his known disability.

108.    Furthermore, upon information and belief, the Defendants determined to subject J.P. to coercive and illegal searches and seizures in May 2016 because the defendants knew or should have known that his disability made him vulnerable to such improper and illegal conduct. This permitted the Defendants to solve a perceived problem by coercing J.P. to confess to conduct for which he was not culpable.

109.    *Inter alia*, Defendants caused and failed to take action to protect J.P. from bullying, harassment and discrimination because of his disabilities as well as themselves engaging in discrimination because of his disabilities. Defendants also retaliated against J.P. for opposing said bullying, harassment and discrimination. Such conduct ultimately resulted in the suicide of J. P.

110.    As a direct proximate cause of Defendants' aforementioned unlawful acts and omissions, Plaintiffs and Plaintiffs decedent have been injured and harmed and are entitled to compensation therefor.

## AS AND FOR A EIGHTH CAUSE OF ACTION,
## AS FOR J.P. AND DENISE PIECHOWICZ UNDER THE REHABILITATION ACT

111.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 110 as if fully set forth herein.

112. At all times relevant hereto, J. P. was an individual with a disability under the Rehabilitation Act.

113. At all times relevant hereto, Defendant Lancaster Central School District was a public entity receiving federal financial assistance and thus covered under the Rehabilitation Act.

114. Defendant Lancaster Central School District violated the Rehabilitation Act in that J. P. was subjected to discrimination based on his disabilities while enrolled and attending school at said School District.

115. *Inter alia*, Defendants failed to take action to protect J. P. from bullying, harassment and discrimination because of his disabilities as well as themselves engaging in discrimination because of his disabilities. Defendants retaliated against J. P. for opposing said bullying, harassment and discrimination. Defendants also retaliated against Denise Piechowicz for advocating for her disabled son.

116. As a direct and proximate cause of Defendants' aforementioned unlawful acts and omissions, Plaintiffs and Plaintiffs decedent have been injured and harmed and are entitled to compensation therefor.

### AS AND FOR A NINTH CAUSE OF ACTION, FOR PLAINTIFFS DENISE PIECHOWICZ FOR INTENTIONAL AND/OR RECKLESS AND/OR NEGLIGENT INFLICTION OF SEVERE EMOTIONAL DISTRESS

117. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 116 of this Amended Complaint.

118. The actions of Defendant Peter F. Kruszynski, were outrageous and utterly intolerable in a civilized community.

119. At all times relevant hereto, Defendant Peter F. Kruszynski acted intentionally and/or recklessly and/or negligently.

120. Defendant Peter F. Kruszynski actions caused Plaintiff J. P. severe emotional distress, which directly caused him inury and caused his death.

121. As a direct and proximate result of Defendant's outrageous actions, Plaintiffs and Plaintiffs decedent have suffered injury and harm and are entitled to compensation therefor.

**AS AND FOR A TENTH CAUSE OF ACTION,
AS FOR J. P. UNDER N.Y. CIVIL RIGHTS LAW §79-n**

122. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 121 above.

123. All Defendants, through acts of omission or commission, intentionally selected J.P. for harm, and caused J. P. injury and harm as set forth in the proceeding paragraphs in whole or in substantial part because of a belief or perception regarding J.P.'s disability.

124. The acts and/or omissions of the Defendants constituted a hate crime.

125. As a direct result and proximate result of Defendants' actions and/or omissions, Plaintiff and Plaintiffs decedent have suffered injury and harm as set forth herein and are entitled to compensation therefore.

**WHEREFORE**, Plaintiffs respectfully requests judgement against the Defendants, jointly and severely as follows:

a) Judgement awarding Plaintiffs compensatory damages in a sum to be determined at trial of this matter, exceeding the jurisdictional minimum;

b) Judgement awarding Plaintiff punitive damages in a sum to be determined at trail of this matter

c) For each Cause of Action, granting the following injunctive relief:

    1. Require the Defendants to review and correct all unconstitutional, discriminatory and retaliatory treatment and conduct within the Lancaster Central School District;

    2. Provide equal opportunities, terms, and benefits to all students attending schools in the Lancaster Central School District;

    3. Mandate training and educational programs for employees and students about discrimination and retaliation;

    4. Require annual reports demonstrating efforts and success at compliance in providing a discrimination, harassment and bully free education environment;

d) Attorney's fees and costs as provided by law, including but not limited to 42 U.S.C. §1988.

e) Declaratory relief that the Defendants violated the Plaintiffs right under the law;

f) Granting such other and further relief as the Court may deem just and proper.

DATED: Buffalo, New York
      January 6, 2020

/s/ Timothy M. Hudson

Timothy M. Hudson, Esq. for
BROWN CHIARI LLP
**Attorneys for Plaintiff**
2470 Walden Avenue
Buffalo, New York 14225-4751
(716) 681-7190

*DENISE PIECHOWICZ vs.*

*LANCASTER CENTRAL SCHOOL DISTRICT & TOWN OF LANCASTER*

*DENISE PIECHOWICZ*
*October 13, 2016*



**METSCHL**
AND ASSOCIATES

COURT REPORTERS • LEGAL VIDEO SERVICES

Buffalo, NY: 716 856-1906
Rochester, NY: 585 697-0969
Toll Free: 800 397-1796

*Min-U-Script® with Word Index*

1

STATE OF NEW YORK
SUPREME COURT:    COUNTY OF ERIE

_____

DENISE PIECHOWICZ, Individually and as Administratrix
of the Estate of ▇▇▇▇▇ ▇▇▇▇▇▇▇ Deceased,

     Claimant,

     vs

LANCASTER CENTRAL SCHOOL DISTRICT and
TOWN OF LANCASTER,

     Defendants.

_____

Examination of DENISE PIECHOWICZ, held pursuant to

Section 50-h of the General Municipal Law and Rules, in

the law offices of Brown Chiari, LLP, 2470 Walden Ave.,

Buffalo, New York, on Thursday, October 13, 2016, at

10:05 a.m. before Coleen Wright, Notary Public.

2

```
 1        APPEARANCES:
          BROWN, CHIARI, LLP,
 2        By: COLLEEN P. FAHEY, ESQ.,
          2470 Walden Avenue,
 3        Buffalo, New York 14225,
          Appearing for the Plaintiff.
 4
          SUGARMAN LAW FIRM, LLP,
 5        By: DANIEL T. CAVARELLO, ESQ.,
          1600 Rand Building,
 6        14 Lafayette Square,
          Buffalo, New York 14203,
 7        Appearing for the Defendant Lancaster Central
          School District.
 8
          GOLDBERG, SEGALLA, LLP,
 9        By: JULIE P. APTER, ESQ.,
          665 Main Street,
10        Suite 400,
          Buffalo, New York 14203,
11        Appearing for the Defendant Town of Lancaster.

12

13

14

15

16

17

18

19

20

21

22

23
```

3

```
 1                    I N D E X

 2

 3   WITNESS                              PAGE

 4   DENISE PIECHOWICZ

 5        Examination by Mr. Cavarello. . . . . . .    4

 6        Examination by Ms. Apter. . . . . . . . .   62

 7

 8

 9

10

11                  E X H I B I T S

12                   (None marked.)

13

14

15

16

17

18

19

20

21

22

23
```

1     MS. FAHEY:  We'll reserve the right to read

2     and sign.

3

4          (Whereupon, the following stipulations

5     were entered into by the respective parties:

6          It is hereby stipulated by and between

7     counsel for the respective parties that the oath

8     of the referee is waived, filing and

9     certification of the transcript are waived, and

10     all objections, except as to the form of the

11     question, are reserved until the time of trial.)

12

13     DENISE PIECHOWICZ, 16 Liberty Avenue, Lancaster, New

14     York 14086, after being duly called and sworn,

15     testified as follows:

16

17  EXAMINATION BY MR. CAVARELLO:

18

19  Q.     Good morning, ma'am.

20  A.     Good morning.

21  Q.     Again, my name is Dan Cavarello and I am here on

22     behalf the Lancaster School District.  I'm going to

23     ask you some questions about the notice of claim

| | |
|---|---|
| 1 | received back in August with respect to the |
| 2 | situation involving your son ██████ I guess before |
| 3 | I begin I just want to express to you that I'm very |
| 4 | sorry for your loss. |
| 5 | A.    Thank you. |
| 6 | Q.    None of my questions here today are meant to |
| 7 | embarrass you or cause you any additional heartache, |
| 8 | but I do have to ask some questions about the |
| 9 | allegations made here, okay?  Do you understand |
| 10 | that? |
| 11 | A.    Yes. |
| 12 | Q.    Just a couple rules before we begin here.  If I ask |
| 13 | you a question that you don't understand just please |
| 14 | tell me that and I'll be happy to try to rephrase |
| 15 | it. |
| 16 | A.    Sure. |
| 17 | Q.    It's very important that only one of us is speaking |
| 18 | at a time, so I'm going to try very hard to try to |
| 19 | not interrupt you, and I would ask that you try not |
| 20 | to interrupt me so that the court reporter can take |
| 21 | down everything we say and we can get a clear record |
| 22 | of what happens here today, okay? |
| 23 | A.    Yes. |

| | | |
|---|---|---|
| 1 | Q. | I'll also probably be calling you ma'am for most of |
| 2 | | the morning, because I don't think I can |
| 3 | | successfully pronounce your name correctly, so |
| 4 | | please don't take offense to that. |
| 5 | A. | I never do. |
| 6 | Q. | And if you do need to take a break at some point we |
| 7 | | can certainly do that, but if there's a question |
| 8 | | pending we're going to ask you to answer that first |
| 9 | | unless you attorney tells you not to, okay? |
| 10 | A. | Okay. |
| 11 | Q. | I'd like to start with some background questions |
| 12 | | about you, ma'am. |
| 13 | A. | Okay. |
| 14 | Q. | How old are you today? |
| 15 | A. | Forty-six. |
| 16 | Q. | What is your marital status? |
| 17 | A. | Married. |
| 18 | Q. | How about your highest level of education? |
| 19 | A. | Bachelor's degree, University of Buffalo. |
| 20 | Q. | Okay.  What is that in? |
| 21 | A. | It's in social work and sciences. |
| 22 | Q. | Okay. |
| 23 | A. | Behavioral sciences. |

| 1 | Q. | About when did you get that? |
|---|----|------------------------------|
| 2 | A. | 1994. |
| 3 | Q. | Are you currently employed outside the home? |
| 4 | A. | No. |
| 5 | Q. | When was the last time you were? |
| 6 | A. | 2008. |
| 7 | Q. | Okay.  And what was your last employment? |
| 8 | A. | Catholic Health System. |
| 9 | Q. | Okay.  What did you do for them, ma'am? |
| 10 | A. | Case manager. |
| 11 | Q. | Your husband's name, ma'am? |
| 12 | A. | Nicholas. |
| 13 | Q. | And how old is he? |
| 14 | A. | He is forty-five and he's a junior. |
| 15 | Q. | Nicholas, Jr.? |
| 16 | A. | Umm-hmm. |
| 17 | Q. | Okay.  How about his highest level of education? |
| 18 | A. | High school. |
| 19 | Q. | And is Nicholas employed? |
| 20 | A. | Yes. |
| 21 | Q. | What does he do? |
| 22 | A. | He is a correctional officer. |
| 23 | Q. | Where does he work? |

| 1 | A. | Attica prison. |
|---|----|----|
| 2 | Q. | And about how long has he done that? |
| 3 | A. | Twelve years this November. |
| 4 | Q. | Okay.  All right.  Do you have any other children? |
| 5 | A. | Yes. |
| 6 | Q. | Can you give me their names and ages, please? |
| 7 | A. | Sure.  I have a stepdaughter Brittany and she is |
| 8 |  | twenty-two. |
| 9 | Q. | And what is Brittany's last name? |
| 10 | A. | Piechowicz. |
| 11 | Q. | Okay.  All right. |
| 12 | A. | And ████, ████████ Piechowicz, and she is ten. |
| 13 | Q. | Had you ever been married before? |
| 14 | A. | No. |
| 15 | Q. | Ma'am, what was ████████ date of birth? |
| 16 | A. | ████████. |
| 17 | Q. | Do you know ████████ Social Security Number? |
| 18 | A. | Not offhand, no. |
| 19 | Q. | Is that information that you have -- |
| 20 | A. | Yes. |
| 21 | Q. | -- someplace? |
| 22 | A. | Yes, I do. |
| 23 | Q. | Okay. |

| | | |
|---|---|---|
| 1 | A. | Oh, I might have it.  I could look.  I have a |
| 2 | | picture of his death certificate on my phone that I |
| 3 | | could probably look up and get. |
| 4 | Q. | I'll tell you what; when we take a break we can get |
| 5 | | that, and your attorney will explain to you why we |
| 6 | | need that, okay? |
| 7 | A. | Okay. |
| 8 | Q. | How about grandparents; did Jordan have |
| 9 | | grandparents? |
| 10 | A. | Yes. |
| 11 | Q. | Can you give me their names? |
| 12 | A. | Peggy Jaskowiak, J-A-S-K-O-W-I-A-K. |
| 13 | Q. | Okay. |
| 14 | A. | It's my mother. |
| 15 | Q. | And that's your maiden name? |
| 16 | A. | Yes. |
| 17 | Q. | Okay. |
| 18 | A. | And then Nick and Diane Piechowicz. |
| 19 | Q. | All right.  And did [redacted] have any type of |
| 20 | | relationship with those folks, with his |
| 21 | | grandparents? |
| 22 | A. | More with my mother. |
| 23 | Q. | Okay.  And how about with Nicholas and Diane? |

```
 1   A.    Not in the past six years.
 2   Q.    Was there any particular reason for that?
 3   A.    Yes.  There was an order of protection --
 4   Q.    Without getting into --
 5   A.    -- with his grandfather.
 6   Q.    Without getting into all the details of that, how
 7         did that come about?
 8   A.    He's been sick for a number of years with -- he must
 9         have had over twenty surgeries with rheumatoid
10         arthritis and osteoarthritis, and he's taken three
11         hundred painkillers a month, and he's just -- he
12         wasn't right, and he wanted to drive the kids, I
13         wouldn't let him, and he started getting angry with
14         me, so he came over our house one day and he wanted
15         to beat up Nick, and Nick goes call the police
16         because I'm not touching him.
17               MS. FAHEY:  That's okay.
18   BY MR. CAVARELLO:
19   Q.    So something out of Family Court?
20   A.    Yes.
21   Q.    Okay.  And does your mom live locally?
22   A.    Cheektowaga.
23   Q.    All right.  So who was -- I guess as of May of 2016
```

```
 1              who was residing at the Liberty Avenue address?
 2   A.    Me, ████ ████, and Nick.
 3   Q.    Okay.  At the time he passed away did Jordan have
 4         any medical conditions?
 5   A.    He always had acid reflux since the time of age -- I
 6         believe he was diagnosed at age two.
 7   Q.    Okay.  Anything else?
 8   A.    He had many surgeries with ears, problems with ear
 9         infections, he had tubes, and then he had his
10         tonsils taken out.
11   Q.    Who was his pediatrician?
12   A.    Genesee Transit Pediatrics.
13   Q.    Okay.
14   A.    Dr. Dzik, D-Z-I-K.
15   Q.    Okay.  Had he ever treated for any
16         psychological-type issues?
17   A.    Never.
18   Q.    Had he ever been prescribed any medication for any
19         issues like that?
20   A.    No.
21   Q.    Depression, anxiety, anything like that?
22   A.    Never.
23   Q.    Had he ever met with counselors at school to your
```

```
1            knowledge?
2    A.      No.
3    Q.      And how about any outside counselors?
4    A.      Never.
5    Q.      Let me ask you about ████████ academic history.  Did
6            he start --
7                    MS. FAHEY:  Excuse me, Dan.
8                    MR. CAVARELLO:  Yes.
9                    MS. FAHEY:  Can we stop for one second and
10           go off the record?
11                   MR. CAVARELLO:  Sure.
12                   (Discussion off the record.)
13   BY MR. CAVARELLO:
14   Q.      Ma'am, before we broke I was about to start asking
15           you about ████████ academic career, and I believe I
16           asked you whether he started with the Lancaster
17           schools in kindergarten; is that correct?
18   A.      Yes.
19   Q.      So where did he go to elementary school?
20   A.      Went to Como Park Elementary.
21   Q.      Okay.
22   A.      And then to William Street, and then he was at the
23           middle school when he passed.
```

```
 1    Q.    All right.  So William Street went to what grade?

 2    A.    Sixth.

 3    Q.    All right.  So when he got to seventh grade then he

 4          was over to the middle school?

 5    A.    Yes.

 6    Q.    Now, in terms of his elementary school career, did

 7          he have any disciplinary issues there?

 8    A.    Never once.

 9    Q.    Did he ever get in trouble at school?

10    A.    He never got in trouble.

11    Q.    And how about his academic performance; how would

12          you describe that in the elementary schools?

13    A.    He was definitely a special needs' child.

14    Q.    At some point was he referred to the Committee on

15          Special Education?

16    A.    Yes.

17    Q.    Do you know what grade that occurred?

18    A.    Well, when he started kindergarten, parent/teacher

19          conference, the teacher noticed something.  He

20          wasn't diagnosed at the time.  She couldn't put her

21          finger on it.  So I went on my own and paid for an

22          evaluation to have them done.

23    Q.    What was --
```

|     |     |                                                                      |
| --- | --- | -------------------------------------------------------------------- |
| 1   | A.  | It was hearing and speech on Elmwood, I don't know                   |
| 2   |     | if it was Ken-Ton Hearing & Speech, and there he was                 |
| 3   |     | diagnosed with auditory processing disorder by Dr.                   |
| 4   |     | Hillary.  She's supposed to be one of the best                       |
| 5   |     | doctors for that.                                                    |
| 6   | Q.  | This was in kindergarten?                                            |
| 7   | A.  | Yes.                                                                 |
| 8   | Q.  | Okay.                                                                |
| 9   | A.  | Because if I would have waited the school would have                 |
| 10  |     | tested him I believe in first or second grade, and I                 |
| 11  |     | didn't want to wait, so I did it on my own.                          |
| 12  | Q.  | So when you got the results of that did you share                    |
| 13  |     | that with the school?                                                |
| 14  | A.  | Absolutely.  I took three copies, to the principal,                  |
| 15  |     | the speech pathologist, and the social worker, I                     |
| 16  |     | believe, at the time.                                                |
| 17  | Q.  | And were there any special services provided to him                  |
| 18  |     | --                                                                   |
| 19  | A.  | Yes.                                                                 |
| 20  | Q.  | -- at that point?                                                    |
| 21  | A.  | Yes.  That's when he started in with speech.                         |
| 22  |     | MS. FAHEY:  You're just cutting off the end                          |
| 23  |     | of his question --                                                   |

```
 1              THE WITNESS:  I'm sorry.
 2              MS. FAHEY:  -- so if you could be conscious
 3       of that and pause for a second.
 4              THE WITNESS:  Sure.
 5              MS. FAHEY:  Thank you.
 6  BY MR. CAVARELLO:
 7  Q.    He had speech services.  Anything else?
 8  A.    In kindergarten I'm not sure.  I'm not sure when
 9        everything began, if it was first grade or if it was
10        kindergarten, but I believe his speech was started
11        right away in kindergarten.
12  Q.    At what point did he actually have an IEP?  When did
13        that start?
14  A.    I'm not sure if it was kindergarten or first grade.
15  Q.    Okay.  And are you able to tell us what services he
16        received as part of the IEP?
17  A.    When he first started?
18  Q.    Yeah.  Whenever it was, kindergarten or first grade.
19  A.    Yes.  He was receiving speech and then he was in a
20        room with Mr. Edwards, who was the special ed
21        teacher, every day I believe for like an hour with
22        Mr. Edwards.
23  Q.    Okay.
```

```
 1   A.   And then he also had a reading teacher that would
 2        come in, and I believe she sat in the classroom with
 3        him, and I'm not sure about the math.
 4   Q.   Were you part of the annual meetings --
 5   A.   Yes.
 6   Q.   -- about his IEP after that?
 7   A.   Yes.
 8   Q.   And any of the services that he had in elementary
 9        school, did they change as he got older?
10   A.   They were trying to pull back on services when he
11        went to William Street and it didn't work.
12   Q.   Okay.  And what do you mean by pull back?
13   A.   Like I think they were -- they pulled back on
14        speech, I know that, and then at one point they
15        increased it to math, reading, and then I think they
16        pulled back on the math and said it wasn't working,
17        so we had to put it back, so he remained pretty
18        constant throughout.
19   Q.   Did you ever have any disputes or disagreements with
20        the district with his special ed services while he
21        was in elementary school?
22   A.   Never.
23   Q.   Was there a particular person you dealt with on
```

```
 1            special ed issues when he was an elementary school
 2            student?
 3   A.       Yes.  At Como Park I dealt with Mr. Edwards.
 4   Q.       Okay.  And how about at William Street?
 5   A.       At William Street I believe it changed every year,
 6            and I can't remember everyone I dealt with there.
 7   Q.       Okay.  So how about when he got to middle school,
 8            seventh grade, did he still have an IEP?
 9   A.       Yes.
10   Q.       And did you have a primary point of contact at the
11            middle school?
12   A.       I did.  Her name ain't coming to me right now.  I
13            can see her face, too.
14   Q.       Do you know what her position was?
15   A.       Yes, special ed teacher.
16   Q.       Is it Miss Baker?
17   A.       Yes, it was, and she was the same seventh and eighth
18            grade.
19   Q.       Okay.  So was she assigned to ████████?
20   A.       Yes.
21   Q.       So was she with him all the time?
22   A.       No, no, but she -- from my understanding is she
23            would meet with █████ for I think it was one period
```

1    a day, and in that time she would go over all his

2    assignments to make sure he had everything done,

3    everything he needed, any help.  It was like that

4    extra services to get him organized.

5  Q.    And did you have regular communication with Miss

6        Baker?

7  A.    She had -- she would call me before our IEPs.  She

8        -- I didn't have too much contact with her.  She

9        sent me copies after IEP meetings, but that's the

10       extent of it.

11 Q.    Okay.  Did she ever report any issues with ▮▮▮▮ to

12       you?

13 A.    Never.

14 Q.    Did you ever have any disputes or disagreements with

15       her --

16 A.    No.

17 Q.    -- about ▮▮▮▮?

18 A.    No.

19 Q.    Okay.  How was his academic performance as a

20       seventh-grader?

21 A.    Improving.

22 Q.    Okay.  Now, by the time they get to middle school

23       they're getting actual grades, right?

1   A.   Yes.

2   Q.   Can you tell us grade point wise what his grades

3        were like?

4   A.   I know for eighth grade he was almost on honor roll,

5        that's how high he was getting.  Seventh grade I

6        think was more in the 80s overall.

7   Q.   And was he ever in any kind of trouble at school as

8        a seventh-grader?

9   A.   No.

10  Q.   Was he assigned to a school counselor as a

11       middle-schooler?

12  A.   I believe so.

13  Q.   Do you know who that was?

14  A.   No.

15  Q.   Do you know if he ever met with a school counselor

16       as a seventh-grader?

17  A.   It was his academic counselor, like your guidance

18       counselor.  He had meet with the guidance counselor

19       to go over his ninth-grade schedule.

20  Q.   Okay.  Are you aware of him meeting with any

21       counselors at school for any other reasons?

22  A.   No, not that I'm aware of.

23  Q.   Was ███████ involved in extracurricular activities?

```
 1   A.      Yes.

 2   Q.      Can you tell us about those?

 3   A.      Modified football, seventh and eighth grade.

 4                MS. APTER:  I'm sorry.  What was the second

 5           part?

 6                THE WITNESS:  It was modified football,

 7           seventh and eighth grade.

 8                MS. APTER:  Okay.

 9   BY MR. CAVARELLO:

10   Q.      Had he played football prior to that?

11   A.      No.  I'm sorry.  He wasn't in seventh grade.  He

12           started only in eighth grade.  His friends, yeah,

13           convinced him.

14   Q.      And what position did he play?

15   A.      He bounced from offense and defense, first string,

16           second string.

17   Q.      So that would have been the fall of his

18           eighth-grade --

19   A.      Yes.

20   Q.      -- year?

21   A.      Yes.

22   Q.      Any other sports or activities?

23   A.      Hockey.
```

| | | |
|---|---|---|
| 1 | Q. | Did he play travel hockey? |
| 2 | A. | He played -- it was called molle.  It was like a |
| 3 | | modified house league that they did semi-travel. |
| 4 | Q. | What program did he play for? |
| 5 | A. | Buffalo Stars. |
| 6 | Q. | And how many years did he play hockey? |
| 7 | A. | He played hockey since he was eleven, so he was two |
| 8 | | years in hockey. |
| 9 | Q. | Okay.  Any other extracurricular activities he was |
| 10 | | involved in? |
| 11 | A. | No, that's it. |
| 12 | Q. | Okay.  Can you tell us who his -- who his friends |
| 13 | | were, the primary people he hung around with as a |
| 14 | | middle school student? |
| 15 | A. | Yeah. ██████ ██████ |
| 16 | Q. | Do you know how to spell ███████ name? |
| 17 | A. | Last name? |
| 18 | Q. | Yes. |
| 19 | A. | ████████ |
| 20 | Q. | What grade is ██████ in? |
| 21 | A. | Same as ██████ |
| 22 | Q. | Do you know how long they had been friends? |
| 23 | A. | No. |

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

| | | |
|---|---|---|
| 1 | Q. | Anyone else? |
| 2 | A. | ███████ ████████ ███████ ████████ |
| 3 | Q. | Also an eighth-grader? |
| 4 | A. | Yes. |
| 5 | Q. | Okay.  And do you know how long they had been |
| 6 | | friends? |
| 7 | A. | I believe since William Street. |
| 8 | Q. | Okay.  Anyone else that comes to mind? |
| 9 | A. | ███████████. |
| 10 | Q. | Is that with a K or a C? |
| 11 | A. | K. |
| 12 | Q. | Okay.  Is it ████████████? |
| 13 | A. | Yes, it is. |
| 14 | Q. | And was █████ in eighth grade? |
| 15 | A. | Yes. |
| 16 | Q. | Anyone else you can recall? |
| 17 | A. | And then he spent a lot of time with the Buffalo |
| 18 | | Stars' team. |
| 19 | Q. | Okay.  So was he a Pee Wee level? |
| 20 | A. | He was Pee Wee and this year was -- well, the past |
| 21 | | year was Bantum. |
| 22 | Q. | Bantum.  Okay.  Do you know who his coaches were for |
| 23 | | the stars? |

```
 1   A.    Yeah.  It was -- oh, my God.  I'm going blank.  Oh,
 2         my God.  I'll think of it.
 3   Q.    If you do we can come back to it.  If it comes to
 4         you in an half an hour or so --
 5   A.    It will.
 6   Q.    -- just stop me and we'll go back to it.  I want to
 7         ask you about I guess an incident or disciplinary
 8         situation that occurred in March of 2016 at the
 9         middle school, okay?  As I understand it there was
10         some type of an incident where ____ had to meet
11         with the principal and got in some type of trouble,
12         some type of suspension.  Do you know what incident
13         I'm referring to?
14   A.    Yes.
15   Q.    Okay.  And, as I understand it, it involved the way
16         he was dressed or the way he was sitting in class.
17         Are we talking about the same incident?
18   A.    Yes.
19   Q.    Okay.  When did you become aware that this issue had
20         arisen at school?
21   A.    When the principal called me that day.
22   Q.    Okay.  And is that Mr. Kruszynski?
23   A.    Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Tell us what the principal told you when he called. |
| 2 | A. | He said that there was an incident in the classroom, |
| 3 | | it was like a special reading class, it was part of |
| 4 | | his IEP, and I guess it had a mix of seventh and |
| 5 | | eighth-graders in this classroom.  As I was told, it |
| 6 | | was a smaller room and it was a comfortable room so |
| 7 | | the kids could relax and read. |
| 8 | Q. | And what did he tell you had allegedly occurred in |
| 9 | | the room? |
| 10 | A. | That there were three girls who claimed that ▓▓▓▓▓ |
| 11 | | put his leg up and he was wearing shorts, and that |
| 12 | | he pulled his shorts in a way to expose himself to |
| 13 | | the three girls. |
| 14 | Q. | Okay.  Was it your understanding that this had |
| 15 | | happened one time or more than one time? |
| 16 | A. | Well, when I was first talking with the principal I |
| 17 | | thought that he was talking all three girls in that |
| 18 | | moment, that day, that ▓▓▓▓▓ exposed himself to, |
| 19 | | but as our conversation went on the principal said |
| 20 | | this happened in October, January, and March, and |
| 21 | | that it was just one girl that day who claimed this, |
| 22 | | but then after talking with her other girlfriends |
| 23 | | they came down and told the principal. |

```
 1   Q.    Okay.  So there were three girls that claimed that
 2         it happened on three different occasions?
 3   A.    Yes.
 4   Q.    Okay.  Was this your first contact ever with the
 5         principal?
 6   A.    Umm-hmm.
 7   Q.    Yes?
 8   A.    I didn't even know who the principal was.
 9   Q.    Okay.  So what happened after the telephone
10         conversation?  Did you go to the school, did you
11         meet with him in person?
12   A.    No.
13   Q.    Did he tell you what he was planning on doing about
14         it?
15   A.    When I was talking with him I thought he called to
16         talk to me about the situation, and I thought he was
17         like looking for my opinion on what to do, but
18         everything was done already.  I was being told what
19         had happened after the fact, and then he said that
20         he put ███████ in in-school suspension and that today
21         is almost over, so he already has one under his
22         belt, and that he had two more days.
23   Q.    And how did you react to that?
```

**METSCHL & ASSOCIATES**
Buffalo: 716-856-1906   Rochester: 585-697-0969

| | | |
|---|---|---|
| 1 | A. | And then I -- then I got -- I said -- I got upset, |
| 2 | | because then when I found out that this had happened |
| 3 | | three different times I said why wasn't I notified |
| 4 | | back in October or the other times and why am I |
| 5 | | hearing about it today and why are you believing all |
| 6 | | three of them over my son, and then he told me they |
| 7 | | were credible and he had to believe them. |
| 8 | Q. | Did he indicate that he had spoken to ▇▇▇▇ about |
| 9 | | it? |
| 10 | A. | Yes. |
| 11 | Q. | And what had ▇▇▇▇ said? |
| 12 | A. | Jordan tried to explain to him what had happened in |
| 13 | | the classroom, that he normally would sit at the |
| 14 | | table and put up his foot to read, and the way the |
| 15 | | room is, ▇▇▇▇ happened to be higher than the |
| 16 | | girls.  The girls were at a lower level on this |
| 17 | | couch.  And ▇▇▇▇ explained that to the principal |
| 18 | | as far as the principal had told me. |
| 19 | Q. | Did you ever speak to ▇▇▇▇ yourself about it? |
| 20 | A. | Yes, I did. |
| 21 | Q. | And what did he tell you? |
| 22 | A. | He came home crying -- well, first I got a text. |
| 23 | | After I hung up with the principal I got a text from |

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

```
 1              ███████, and in the text ████████ says, mom, I'm being
 2         accused of something I didn't do, and I believe I
 3         replied I know, he called me.  And then ████████ says
 4         I'm really upset right now.  And I said can you go
 5         talk to a counselor, and then I said do you want me
 6         to come in, I text him, do you want me to come in
 7         and talk to the principal.  He said no.  That's when
 8         I said can you go talk with a counselor, and he said
 9         yeah.  And then I said I'll talk to you when you get
10         home.
11    Q.    Do you know if he went and spoke to a counselor?
12    A.    I don't believe he did.   I believe it was towards
13         the end of the day already when this was going on.
14    Q.    Did he say why he was really upset?
15    A.    Because he didn't do it.  He was being accused of
16         something he didn't do.
17    Q.    How did he explain it to you?  Did he indicate --
18    A.    He came home crying.
19    Q.    -- it was an accident or something, or --
20    A.    He came home crying.  He was so upset because nobody
21         would listen to him.  He was telling the truth and I
22         guess the principal just didn't want to hear it.
23    Q.    What did ████████ tell you when he got home about what
```

```
 1          exactly --
 2   A.     He started --
 3   Q.     -- happened?
 4              MS. FAHEY:  Wait for the question.
 5              THE WITNESS:  I'm sorry.
 6   BY MR. CAVARELLO:
 7   Q.     That's okay.  What did he tell you happened?
 8   A.     He came home, he was crying, and he said, ma', I
 9          didn't do it, and he said the way he reads -- and
10          ████████ wears shorts every day to school, that's just
11          his thing.  He said he had put his leg up on the
12          table to read.
13   Q.     Did he say anything else?
14   A.     No, because he didn't know what he did.  He didn't
15          do anything.
16   Q.     After you spoke to ████████ did you have any further
17          contact with the principal?
18   A.     No.
19   Q.     Was there any particular reason why you didn't call
20          him back or speak to someone else at the school?
21   A.     Yes, because then when my husband got home from work
22          I told my husband what had happened and we talked
23          with ████████ and, again, ████████ started crying, and
```

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

| | |
|---|---|
| 1 | | we told him we believed him and we told him, well, |
| 2 | | you already got a day in suspension, he felt like no |
| 3 | | one was going to believe him anyway, so do the two |
| 4 | | more days, you're almost out of that school, you're |
| 5 | | going to have a fresh start at the high school, and |
| 6 | | that will be the end of it.  So _____ took it like |
| 7 | | a man.  He took the punishment and moved on. |
| 8 | Q. | Now, that was in the first part of March.  Did |
| 9 | | _____ remain in that reading class after his |
| 10 | | suspension was up? |
| 11 | A. | No. |
| 12 | Q. | And why not? |
| 13 | A. | He -- we talked -- because this happened on a |
| 14 | | Friday, so we were talking over the weekend and he |
| 15 | | says he don't want to be in that class anymore, he |
| 16 | | felt he didn't need it to begin with, and that he |
| 17 | | didn't want to be back in that room and be accused |
| 18 | | again. |
| 19 | Q. | Okay.  So did you take some action? |
| 20 | A. | Yes.  I had called his counselor, his academic |
| 21 | | counselor, but the one that he deals with wasn't -- |
| 22 | | I don't know if she was on maternity leave or what, |
| 23 | | so I was referred to another counselor who I |

1  couldn't get a hold of.  So I contacted the teacher

2  in his classroom and she said that -- I told her

3  what happened.  She said she would get -- she agreed

4  with me, the best thing would be to get ███████ out

5  of that classroom.  She had contacted the counselor.

6  The counselor called me at the end of the day, says

7  we got him out, we put him in a study hall.  That

8  was the end of it.  I got a letter following that up

9  I think a week later.

10  Q.  Now, other than that first day when he came home and

11      was crying about it was he ever upset about that

12      particular incident again in your presence?

13  A.  Yeah.  He was upset until the punishment was over,

14      'cause when he went to return for the second day in

15      school he said his football coach, his gym teacher,

16      and two other teachers had walked by, saw him in the

17      in-school suspension room and says what the hell are

18      you doing there.  They couldn't believe it, because

19      he don't get in trouble, he's a good kid, and ███████

20      was upset because he told them and they're like, aw,

21      man.  He came home telling me that.  He says even my

22      teachers know I don't belong in there.

23  Q.  Did he suffer any consequences as far as the

```
 1           football team was concerned?
 2    A.     No.  This was past football season.
 3    Q.     After the suspension was over do you know whether he
 4           sought out anybody at school to talk to them about
 5           this, a teacher or counselor or anything?
 6    A.     He was happy to be out of that classroom, so he was
 7           content.
 8    Q.     Okay.  Did he know these girls that made the
 9           accusations?
10    A.     He told me he didn't know their names, but he did
11           say they were seventh-graders.
12    Q.     As far as that incident was concerned was the
13           principal the only person from the school that spoke
14           to him about it, as far as you know?
15    A.     Yes.
16    Q.     And do you know if anyone else was present when the
17           principal spoke to him about that incident?
18    A.     I don't know.
19    Q.     Were there any further incidents involving your son
20           either at school or outside of school where you
21           noticed him being upset about anything between March
22           and May 6th?
23    A.     No.  He was -- he was very happy because his team
```

```
 1              was winning, they were going to the championship.
 2              He spent a lot of time with the Buffalo Stars and he
 3              was looking forward to doing trainings in the
 4              summer.  It was the same trainers that worked with
 5              the Buffalo Sabres, so he was really excited.
 6    Q.        So this would be his Bantum team?
 7    A.        Umm-hmm.
 8    Q.        Yes?
 9    A.        Yes.
10    Q.        Was the hockey season over by early May?
11    A.        It was over by the end of April.
12    Q.        Okay.  And did they -- you say they won the
13              championship?
14    A.        They went to the championship.  They lost, but they
15              went to the championship.
16    Q.        Okay.  So as of early May was that a break in the
17              hockey season at that point?
18    A.        Yes.  He was not -- the Buffalo Stars was over, but
19              he was already into Dippin' Dots.  He was with the
20              summer league already, so he started training
21              already for the Dippin' Dots, I believe.
22    Q.        Did he do that at Holiday?
23    A.        It was between Holiday and -- what's the other one?
```

| | | |
|---|---|---|
| 1 | Q. | The one in Orchard Park? |
| 2 | A. | Yeah.  They work hand in hand with each other. |
| 3 | Q. | Leisure? |
| 4 | A. | Leisure, yes. |
| 5 | Q. | All right.  So between that first week of March and |
| 6 | | May 6th did you observe any behaviors by ████ that |
| 7 | | caused you any concern? |
| 8 | A. | No. |
| 9 | Q. | Did anyone express to you, you know, anyone from the |
| 10 | | school, any of his friends, any of his family |
| 11 | | members, express to you that he didn't seem like he |
| 12 | | was himself? |
| 13 | A. | No. |
| 14 | Q. | Did he suffer any consequences at home as a result |
| 15 | | of that incident in March? |
| 16 | A. | No, because me and my husband said we believed him. |
| 17 | Q. | All right.  Then let's move ahead to May, if we can, |
| 18 | | okay, ma'am? |
| 19 | A. | Umm-hmm.  Yes. |
| 20 | Q. | All right.  Were you, in fact, contacted again by |
| 21 | | the principal sometime in the morning of May 6th? |
| 22 | A. | Yes. |
| 23 | Q. | Can you tell us about that? |

|    |      |                                                                      |
|----|------|----------------------------------------------------------------------|
| 1  | A.   | Yes.  I was coming -- I know it was right after -- I                  |
| 2  |      | believe it was like right around noon.  I was just                   |
| 3  |      | coming home from grocery shopping and I had                          |
| 4  |      | groceries in my hand, and I took the phone in the                    |
| 5  |      | garage and -- you want me to keep going?                             |
| 6  | Q.   | Yes.                                                                 |
| 7  | A.   | Okay.  And then it was the principal, and he said                    |
| 8  |      | that -- he wanted to explain that ████ was dating                    |
| 9  |      | a girl back in February for three days, they broke                   |
| 10 |      | up, and during that time this girl took a picture of                 |
| 11 |      | her naked behind and sent it to ████                                  |
| 12 | Q.   | Did you know who the girl was?                                       |
| 13 | A.   | No.                                                                  |
| 14 | Q.   | Did you know that ████ had dated a girl for three                    |
| 15 |      | days?                                                                 |
| 16 | A.   | No.                                                                  |
| 17 | Q.   | I'm sorry.  Go ahead.                                                 |
| 18 | A.   | And that this picture made its way to the middle                     |
| 19 |      | school, the high school of Lancaster, and also Depew                 |
| 20 |      | school.                                                              |
| 21 | Q.   | Did he say how that had occurred?                                    |
| 22 | A.   | I guess ████ sent it to a friend and it took on a                    |
| 23 |      | life of its own.                                                     |

| | | |
|---|---|---|
| 1 | Q. | Do you know who ▬▬▬ sent it to? |
| 2 | A. | No. |
| 3 | Q. | Okay.  And how about when he sent it; do you know |
| 4 | | that? |
| 5 | A. | No. |
| 6 | Q. | Okay.  What else did the principal say? |
| 7 | A. | So he said that the girl found out that ▬▬▬ had |
| 8 | | showed the picture that morning to a boy on the bus |
| 9 | | and that the boy on the bus begged ▬▬▬ to see the |
| 10 | | picture, and ▬▬▬ didn't want to show him, but the |
| 11 | | boy begged him, so ▬▬▬ did show him the picture. |
| 12 | | Then the boy who saw the picture told the girl he |
| 13 | | seen the picture who the girl was, and she came to |
| 14 | | the principal's office to report it. |
| 15 | Q. | Now, did you ever learn who the girl was? |
| 16 | A. | No.  That day, no. |
| 17 | Q. | At any point? |
| 18 | A. | Now I know. |
| 19 | Q. | Okay.  Who was it? |
| 20 | A. | ▬▬▬ ▬▬▬. |
| 21 | Q. | When you learned the name was that the first time |
| 22 | | you had ever heard of this girl? |
| 23 | A. | Yes. |



```
 1   Q.   So about what time did you get the call from
 2        Mr. Kruszynski?
 3   A.   It had to be around I want to say five after twelve,
 4        because I was at Save A Lot and I was coming in, and
 5        I just -- I remember looking at the clock in the
 6        garage.  It was somewhere around twelve five, twelve
 7        ten.
 8   Q.   Okay.  So did Mr. Kruszynski indicate whether he had
 9        spoken to ▮▮▮▮▮ about this?
10   A.   So he told me that he had brought in the Lancaster
11        police officer and that they brought ▮▮▮▮▮ in to
12        the office.  ▮▮▮▮▮ admitted to having the picture.
13   Q.   Okay.  What else did he say?
14   A.   He said that they went through his phone, deleted
15        the picture, found more pictures of girls behind a
16        hidden app, no one from the school, and then he told
17        me that he was giving ▮▮▮▮▮ three days of in-school
18        suspension, and I told him the hell you're not.  I
19        said why don't you call Dr. Phil on that girl and
20        her parents.  I said don't punish my son, he didn't
21        do anything wrong, this didn't happen on school
22        property as far as you know.  And he goes yes, it
23        did, it was on the -- the bus is school property,
```

**METSCHL & ASSOCIATES**
Buffalo: 716-856-1906   Rochester: 585-697-0969

```
 1        and then he yelled it a little bit louder than that,
 2        and that upset me, and I said I'm not over March
 3        when you punished my kid for three days for doing
 4        nothing.  I said I'm coming in.  He's telling me the
 5        police are involved.  I'm coming in.  He goes fine,
 6        he says, you can come in.  So I told him I'll be
 7        there in five minutes.  Well, when I got off the
 8        phone I called my husband.  My husband was at work,
 9        working a double.  I called my husband at Attica
10        prison and I told him, I said the principal called,
11        told him what he had said, and my husband was so
12        upset.  He goes call back the school and tell them
13        wait forty minutes, I'm coming, so I did.
14  Q.    Before we go any further, ma'am, did you feel as
15        though it was inappropriate or not correct for
16        ████████ to be punished, even though he had shared the
17        photo on the bus?
18  A.    Why wasn't I called?  The second time I'm called
19        after the fact.  What do you mean you went through
20        -- all these thoughts are going through my head.
21        What do you mean the police are there.  What do you
22        mean you went through his phone.  I was so upset.
23        I couldn't even -- if I'm this upset I can't even
```

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0909

1        imagine what ████████ going through right now.

2  Q.    I understand that, ma'am, but did you disagree that

3        he should be punished for sharing that on the bus?

4  A.    It wasn't my mind frame at the time.

5  Q.    So --

6  A.    I felt outcasted.  I felt like I had no part in

7        this.

8  Q.    All right.  So you were upset that it was already

9        taking place --

10  A.    Done and over with, and then, "just so you know".

11        That's how I felt.

12  Q.    Okay.  All right.  So did you wait for your husband?

13  A.    Yes, I did.  I called back the school, I told them

14        -- told the secretary I'm coming in to meet with

15        Mr. Kruszynski, but it's going to be in forty

16        minutes when my husband gets in from work.  She said

17        okay.

18  Q.    Do you know approximately what time you arrived at

19        the school?

20  A.    It was around one, maybe a little bit after.

21  Q.    Did your husband meet you there?

22  A.    No.  He picked me up.

23  Q.    All right.  And did you meet with the principal?

| | | |
|---|---|---|
| 1 | A. | We did. |
| 2 | Q. | Was anyone else present? |
| 3 | A. | No. |
| 4 | Q. | Tell us about the meeting. |
| 5 | A. | Sat down, he told us the same story he told me on |
| 6 | | the phone.  He was telling it to my husband.  He |
| 7 | | said that the Lancaster police officer who works in |
| 8 | | the school went through ▇▇▇▇ phone, found the |
| 9 | | pictures, deleted the pictures.  He told us about |
| 10 | | the hidden app and that ▇▇▇▇ got three days of |
| 11 | | in-school suspension, which he was already in in |
| 12 | | that moment. |
| 13 | Q. | Okay.  And how did you respond to that information? |
| 14 | A. | I said did you explain to ▇▇▇▇ what he did and why |
| 15 | | he's in in-school, and he says it's in the manual. |
| 16 | | And I said, no, no, did you explain; ▇▇▇▇ has an |
| 17 | | IEP.  And he goes, well, I didn't see you at the |
| 18 | | parent meeting last week.  I go what are you talking |
| 19 | | about.  He goes we had a meeting for apps, hidden |
| 20 | | apps with the phone.  And my husband goes my son has |
| 21 | | special needs; did anybody explain to him.  We were |
| 22 | | getting nowhere.  He wasn't understanding what we |
| 23 | | were trying to ask him.  Then I said, well, I want |

```
 1        to see ▓▓▓▓  I said 'cause the last time he came
 2        home crying that he didn't do it.  He goes I'll get
 3        ▓▓▓▓.  I said okay.  He went, he left the office.
 4        Within seconds he came back with ▓▓▓▓, and ▓▓▓▓
 5        didn't even look at me or my husband.  He sat down
 6        with his head down and says I did it, okay, and then
 7        he got up and ▓▓▓▓ wanted to leave.
 8   Q.   And after ▓▓▓▓ said that did you or your husband
 9        say anything?
10   A.   My husband says I'll see you when I get home.
11   Q.   So at that point did you or your husband -- strike
12        that.  At that point did you agree or disagree with
13        the punishment that Mr. Kruszynski had determined?
14   A.   I disagreed with the punishment.
15   Q.   And why was that?
16   A.   Three days for having something in his private
17        possession -- I don't know.  I just felt both times
18        the crime -- the punishment didn't fit the crime.
19   Q.   Do you feel it was excessive?
20   A.   I do.
21   Q.   Okay.  Did Mr. Kruszynski explain to you what the
22        options were as far as punishment was?
23   A.   There was no options.  That was it.
```

| | | |
|---|---|---|
| 1 | Q. | Do you know whether this was the most severe |
| 2 | | punishment he could have received for this |
| 3 | | particular offense? |
| 4 | A. | Well, he told -- well, when I had mentioned that my |
| 5 | | child is special needs he says that's why he's in |
| 6 | | in-school suspension here and not at Central. |
| 7 | Q. | Did your husband express any agreement or |
| 8 | | disagreement with the punishment during the meeting? |
| 9 | A. | I don't -- I don't remember, because the topic |
| 10 | | changed to -- he kept talking about my husband's |
| 11 | | uniform and my husband's work and the topic just |
| 12 | | changed really, really quickly, and I was very |
| 13 | | frustrated when I left. That was it. |
| 14 | Q. | When you asked the principal before ▇▇▇▇ was in |
| 15 | | the room if they had explained to ▇▇▇▇ what he did |
| 16 | | what is it that you were concerned about? |
| 17 | A. | Because he has auditory processing disorder. ▇▇▇▇ |
| 18 | | can only understand one thing at a time and he needs |
| 19 | | to be explained, and you need a response from him |
| 20 | | that he understands what you're saying. So if you |
| 21 | | don't treat him with what's on his IEP he comes off |
| 22 | | like he knows what you're talking about, when he |
| 23 | | doesn't. So I asked him did you explain, and I got |

| | | |
|---|---|---|
| 1 | | thrown with it's in the handbook and I should have |
| 2 | | been at the parent meeting last week. |
| 3 | Q. | Did ███ say anything else when he came in besides |
| 4 | | something to the effect of I did it, okay? |
| 5 | A. | He told us I did it with his head down.  He couldn't |
| 6 | | look at my husband or I and he was embarrassed and |
| 7 | | walked away. |
| 8 | Q. | So how long was ███ in the room for? |
| 9 | A. | Not even a minute. |
| 10 | Q. | Did he go back to the suspension room? |
| 11 | A. | Yes. |
| 12 | Q. | So did you have any conversation at all with the |
| 13 | | principal after ███ went back about whether there |
| 14 | | were any other options or possibilities for |
| 15 | | punishment? |
| 16 | A. | No. |
| 17 | Q. | So what happened after that?  I think you said that |
| 18 | | the conversation changed.  There was a -- |
| 19 | A. | It changed.  He was just talking about my husband's |
| 20 | | uniform and his work and we left.  My husband had to |
| 21 | | get back to work because he was working a double. |
| 22 | Q. | So did he drive you back home? |
| 23 | A. | Yes. |

```
 1   Q.   Where was ██████ phone after the meeting?
 2   A.   Oh.  He gave it to my husband.
 3   Q.   And did your husband keep it?
 4   A.   Yeah, he took it.
 5   Q.   Did he take it with him back to work?
 6   A.   No.  He gave it to me in the car.
 7   Q.   Okay.  And then what did you do with it?
 8   A.   I put it downstairs on a night stand.
 9   Q.   Was it your intention to take it away from ██████?
10   A.   No.  It was my intention to have my husband sit down
11        with ██████ the next day and talk about this, kind
12        of like a man-to-man thing.
13   Q.   All right.  So when you say downstairs you mean like
14        in the basement?
15   A.   Yeah.  We have like a spare bedroom in the basement.
16   Q.   Does anyone use that?
17   A.   My husband was using it because he just came off of
18        hip surgery and he was staying down there.
19   Q.   So when was your husband scheduled to work until?
20   A.   Eleven o'clock that night.
21   Q.   Did you hear anything further from the school about
22        ██████ for the rest of the school day?
23   A.   No.
```

| | | |
|---|---|---|
| 1 | Q. | Did ████ ride the bus home? |
| 2 | A. | Yes. |
| 3 | Q. | And do you know whether there was any discussion |
| 4 | | about any of this on the bus? |
| 5 | A. | I don't know. |
| 6 | Q. | Were you home when ████ came home? |
| 7 | A. | Yes. |
| 8 | Q. | And what time was that about? |
| 9 | A. | Two forty. |
| 10 | Q. | Did you speak to ████ when he came home? |
| 11 | A. | I said hello. |
| 12 | Q. | Okay.  Did he respond to you? |
| 13 | A. | No.  He had his head down.  He was upset. |
| 14 | Q. | Was anyone else home besides you? |
| 15 | A. | Not at that moment, no. |
| 16 | Q. | Did ████ say anything to you at all? |
| 17 | A. | ████ went to his room, he dropped off his book |
| 18 | | bag, and then he came -- I was in the kitchen, and |
| 19 | | then he came out and asked if he could go shoot some |
| 20 | | pucks on the street and I said yeah. |
| 21 | Q. | Okay.  Did he do that? |
| 22 | A. | Yep.  Yes. |
| 23 | Q. | And about how long did he do that for? |

| | | |
|---|---|---|
| 1 | A. | Until dinner. |
| 2 | Q. | Okay. Was anyone with him? |
| 3 | A. | Not at the time. At first he was by himself on the |
| 4 | | street and then at three thirty-five my daughter |
| 5 | | came home from school and I was -- I was watching |
| 6 | | the boy who lives two doors down, and he was coming |
| 7 | | to our house, also, ████ ████, so ██████ and ██████ |
| 8 | | came home from school, they said can we go and play |
| 9 | | with ██████ on the street. They wanted to shoot |
| 10 | | some pucks with ██████ I said if he lets you, go |
| 11 | | ahead, and ██████ let them, so the three of them |
| 12 | | were shooting some pucks in the street into a net. |
| 13 | Q. | You said ██████ lives on the street? |
| 14 | A. | Yes, two doors down. |
| 15 | Q. | How old is he? |
| 16 | A. | He was nine at the time. |
| 17 | Q. | What is his last name? |
| 18 | A. | ████████████ -- or ████████████. |
| 19 | Q. | And is he friends with ██████? |
| 20 | A. | Yes. |
| 21 | Q. | So the three of them were outside? |
| 22 | A. | Yes. |
| 23 | Q. | About what time are we up to now? |

| | | |
|---|---|---|
| 1 | A. | This was right when they got off the bus so, it's |
| 2 | | right around four o'clock. |
| 3 | Q. | All right. And were you in the house then? |
| 4 | A. | Yes. I was making dinner. |
| 5 | Q. | Do you know how long they remained out there |
| 6 | | shooting pucks? |
| 7 | A. | Well, the phone rang around a little after four, it |
| 8 | | was Dominic, so I called ▆▆▆▆▆. He had his |
| 9 | | Rollerblades on. I called him to the door, gave him |
| 10 | | the phone. He took the call in the garage. That |
| 11 | | lasted for about maybe three minutes, maybe a little |
| 12 | | longer. ▆▆▆▆▆ handed me the phone and went back |
| 13 | | and played with the kids until dinner, which I think |
| 14 | | was around four thirty we started eating. |
| 15 | Q. | So who was -- strike that. Were you all eating |
| 16 | | together? |
| 17 | A. | Yes. Me, ▆▆▆▆ ▆▆▆▆ and ▆▆▆▆. |
| 18 | Q. | Did anything occur during dinner out of the |
| 19 | | ordinary? |
| 20 | A. | No. ▆▆▆▆ -- well, ▆▆▆▆ made a joke saying how |
| 21 | | nice ▆▆▆▆ was to her playing hockey. |
| 22 | Q. | That was atypical? |
| 23 | A. | You know how brothers and sisters are. He was extra |

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

| | | |
|---|---|---|
| 1 | | nice to her that day. |
| 2 | Q. | Can you describe ▉▉▉▉ mood, his demeanor? |
| 3 | A. | It was much better after he played some hockey. |
| 4 | Q. | So was there anything about him at that point that |
| 5 | | you observed that caused you any concern? |
| 6 | A. | Not like concern.  He was still not himself.  He was |
| 7 | | better than when he first came off the bus, but he |
| 8 | | was still like -- he looked like something was |
| 9 | | bothering him. |
| 10 | Q. | Did you ask him at all? |
| 11 | A. | I planned on sitting with ▉▉▉▉ after ▉▉▉▉ left.  I |
| 12 | | didn't want to discuss anything with ▉▉▉▉ being |
| 13 | | there. |
| 14 | Q. | So what time was dinner over? |
| 15 | A. | Closer to five. |
| 16 | Q. | And tell me where everybody went after that. |
| 17 | A. | So ▉▉▉▉ and ▉▉▉▉ went into the living room to play |
| 18 | | Wii, and ▉▉▉▉ came out and said can I lift some |
| 19 | | weights, he has a weight bench in the basement, and |
| 20 | | I said sure, go ahead. |
| 21 | Q. | Was that something he did regularly? |
| 22 | A. | About three, four times a week. |
| 23 | Q. | And did he typically do it around the same time of |

1   day?

2 A. No.  He did it whenever he felt like it.

3 Q. Did anyone go down into the basement with him?

4 A. No.

5 Q. Do you know how long he was down there for?

6 A. A while.  He was down there, had to have been like

7   twenty, twenty-five minutes to half an hour.

8 Q. Do you know what he was doing down there?

9 A. From what I heard you could hear like a clink of the

10   weights, and I could hear the weights from upstairs.

11   I was cleaning up after dinner, so I heard him down

12   there, and I was keeping an eye on the kids in the

13   living room.

14 Q. So it seemed to you from the noise that he was

15   lifting weights?

16 A. Yeah.  Yeah.

17 Q. Did he come back upstairs?

18 A. He did.

19 Q. About what time was that?

20 A. I couldn't tell you the exact time.  All this

21   started happening between like twenty after five to

22   six o'clock we're talking now, and in that time he

23   came back up, went to his bedroom, and then he said

|   |   |   |
|---|---|---|
| 1 |   | can I go outside and shoot some pucks, but this time |
| 2 |   | he wanted to go in the backyard, and that was very |
| 3 |   | normal.  He had a net in the back with some wood and |
| 4 |   | he had regular hockey pucks, not the kind you play |
| 5 |   | in the street, so we set up a spot in the back |
| 6 |   | behind the pool that he could shoot his pucks |
| 7 |   | without hitting no one's house.  It was set up by |
| 8 |   | the trees, and every day he did that. |
| 9 | Q. | So did he have like a shooting board back there or |
| 10 |   | something? |
| 11 | A. | Yeah. |
| 12 | Q. | Okay. |
| 13 | A. | So the last time I ever saw ███████ because I have a |
| 14 |   | patio door -- as I was cleaning up the kitchen I |
| 15 |   | watched him walking.  He had his hockey stick in his |
| 16 |   | hand and he was heading towards the back. |
| 17 | Q. | And that was about what time? |
| 18 | A. | All this -- I couldn't tell you the exact moment, |
| 19 |   | but everything started happening, it was between |
| 20 |   | twenty after five and six o'clock, because right |
| 21 |   | after that the phone rang.  It was the boy's mother |
| 22 |   | from two doors down.  She was saying thank you for |
| 23 |   | watching ████, she's home, you can send him back |

1  now, so she had me on the phone for a while.  So

2  after I hung up with Judy, his mother, I said, ▆▆▆

3  get your stuff together.  So we were getting his

4  school bag, sneakers, all that.  I went to the

5  front, I watched him walk home, and then I said,

6  well -- me and ▆▆▆ came back in, and then we went

7  -- I said where's ▆▆▆, and said, oh, yeah, he's

8  outside.  I called ▆▆▆, ▆▆▆.  I didn't see

9  him, and I called out his name, and ▆▆▆ always

10  where he says he's gonna be, so he wasn't out there,

11  so I went, looked in his room.  I didn't see him.  I

12  went down to the basement and I noticed his phone

13  was gone that I put on that stand, walked around the

14  basement.  So then I text ▆▆▆.  I said where are

15  you, I know you have your phone.  Nothing.

16 Q.  Nothing meaning no response?

17 A.  Uh-uh.

18 Q.  That's a no?

19     MS. FAHEY:  You have to say yes or no.

20 BY MR. CAVARELLO:

21 Q.  There was no response to the text?

22 A.  No.

23 Q.  What did you do after you got no response?

|    |    |                                                                      |
|----|----|----------------------------------------------------------------------|
| 1  | A. | Well, I called my sister.  I said -- I told her what                 |
| 2  |    | was going on, and then she's like why don't you go                   |
| 3  |    | look where he plays hockey, maybe he's with a friend                 |
| 4  |    | or a friend's house.  So I got ███ and I went past                   |
| 5  |    | a couple friends' houses where he might be playing.                  |
| 6  |    | I went by Como Park school, because sometimes they                   |
| 7  |    | play football or hockey, and he wasn't there.  I                     |
| 8  |    | didn't ride around long; came back, and my daughter                  |
| 9  |    | says, mommy, let's go look beyond the trees in our                   |
| 10 |    | backyard.  Sometimes ███ would take a bucket and                     |
| 11 |    | gather his pucks and he'd be back there a while.  I                   |
| 12 |    | said maybe, I said, let's go back there.  So my                      |
| 13 |    | daughter was with me and we went back there, and I                   |
| 14 |    | looked down and I saw his hockey stick and his phone                 |
| 15 |    | to my left, and I looked to my right and he was                      |
| 16 |    | laying there dead -- well, I didn't know he was dead                 |
| 17 |    | at the time.  He was laying there with the gun on                    |
| 18 |    | his stomach and blood on his face.                                   |
| 19 | Q. | Did your daughter see him, also?                                     |
| 20 | A. | Yes.                                                                 |
| 21 | Q. | Was he actually in the rear of your property?  Is                    |
| 22 |    | that where he was?                                                   |
| 23 | A. | It was beyond our property.  We have Christmas trees                 |

```
 1            that divide our property.  He was actually on 363

 2            Aurora's property.

 3     Q.     And were you the first person to find him?  Yes?

 4     A.     Yes.

 5     Q.     So what did you do, ma'am?

 6     A.     Screamed.  The little boy who I had just watched was

 7            playing in his backyard and he came and saw ████.

 8            He ran and got his mom and dad.  I -- I was trying

 9            to call 911.  I couldn't even hit those numbers.  I

10            think I got through to 911, and then Judy came and

11            took the phone from me and she helped me.  Her and

12            her husband took over.

13     Q.     All right.  Did you leave that area at that point?

14     A.     Yeah.  I grabbed my daughter and then I went -- I

15            wanted to take my daughter to my neighbors.  I

16            didn't know my neighbor wasn't home.  I was smacking

17            windows, and before I knew it all my neighbors came

18            and they took ████.

19     Q.     Did someone inform you at the scene or at your home

20            that your son was deceased?

21     A.     Nobody told me anything.  I saw the ambulance come,

22            they went back there, and then I saw them come right

23            out, and I asked one of the Lancaster police
```

|    |    |    |
|----|----|----|
| 1  |    | officers, I said why aren't they taking him, and he |
| 2  |    | says no one told you, and I said no, and he said, |
| 3  |    | sorry, ma'am, he passed. |
| 4  | Q. | Do you know what officer that was? |
| 5  | A. | No. |
| 6  | Q. | Did someone call your husband at some point? |
| 7  | A. | My neighbor Judy. |
| 8  | Q. | Did he come home? |
| 9  | A. | Yeah.  They had him driven home. |
| 10 | Q. | Ma'am, do you know what became of your son's phone |
| 11 |    | from the time you saw it on the ground? |
| 12 | A. | The police couldn't find it, and I couldn't |
| 13 |    | understand, 'cause they taped the whole area off.  I |
| 14 |    | couldn't go back there.  And I told them it was |
| 15 |    | there, but they couldn't find it.  They said if you |
| 16 |    | find it let us know.  And my husband had his father |
| 17 |    | go back there and he found it the next day.   I |
| 18 |    | understand why the police didn't find it. |
| 19 | Q. | Why? |
| 20 | A. | Because where he normally would shoot pucks, that's |
| 21 |    | where I found the phone and the stick, but he went |
| 22 |    | and shot himself behind the neighbor's shed, which |
| 23 |    | was a lot further away, so it made sense for me to |

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

```
 1              know it's there, but not for them.
 2    Q.        So it wasn't at the immediate scene?
 3    A.        No.  He dropped it and then ran.
 4    Q.        Do you know whether the police or anyone looked
 5              through the phone after they found it?
 6    A.        Yes.  The detective, W-O-J-C-I-K, Wojcik, when we
 7              found the phone, he asked if he could go look
 8              through it and my husband said he could.  We didn't
 9              know the pass -- the password, and my husband says
10              you're never gonna get it in, because he said
11              they're still trying in California to get into that
12              phone, and he got in it within an hour, and we were
13              burying ████████ with the phone.
14    Q.        And why was that?
15    A.        Because that was ████████ thing.  That was his baby.
16    Q.        Do you know if the police found anything on it of
17              significance?
18    A.        He says nothing was on there.  I guess the detective
19              told my husband they were looking if ████████ was
20              being threatened or anything and there was no
21              bullying or anything like that.
22    Q.        Do you know if ████████ posted anything or sent
23              messages of anything --
```

METSCHL & ASSOCIATES
Buffalo: 716-856-1906    Rochester: 585-697-0969

```
 1    A.      Yeah.
 2    Q.      -- before he died?
 3    A.      I was told --
 4                    MS. FAHEY:  You have to wait for his
 5            question.
 6                    THE WITNESS:  I'm sorry.
 7    BY MR. CAVARELLO:
 8    Q.      I'm sorry.  Go ahead.
 9    A.      Say it again.  I'm sorry.
10    Q.      Do you know whether ████████ posted anything or sent
11            any messages to anyone before he died?
12    A.      Yeah.  I was told by the detective that there was
13            like a suicide note left on Instagram.
14    Q.      Did the detective tell you what it said?
15    A.      I didn't want to know.
16    Q.      Did you ever come to learn how ██████ had gotten
17            access to a gun?
18    A.      Yes.
19    Q.      How was that?
20    A.      My husband had a gun downstairs in a lock box and
21            that's the gun he used.
22    Q.      Do you know how he was able to get into the lock
23            box?
```

| | | |
|---|---|---|
| 1 | A. | When they found the lock box it was still locked. |
| 2 | | It was pried open. |
| 3 | Q. | Did your husband generally keep the gun loaded? |
| 4 | A. | It wasn't loaded. |
| 5 | Q. | It wasn't loaded in the box you mean? |
| 6 | A. | Yes. |
| 7 | Q. | Did he also have ammunition someplace in the |
| 8 | | basement? |
| 9 | A. | Yes. |
| 10 | Q. | After ▮▮▮▮ passed away did anyone from the family, |
| 11 | | you, your husband, had anyone done any social media |
| 12 | | postings about what had happened at the school? |
| 13 | A. | No. |
| 14 | Q. | Was there ever a posting that you were aware of that |
| 15 | | said something to the effect of that your son had |
| 16 | | been bullied by the Lancaster principal? |
| 17 | A. | No. |
| 18 | Q. | Do you have any knowledge of ▮▮▮▮ having been |
| 19 | | bullied or mistreated by any other student at the |
| 20 | | school? |
| 21 | A. | Never. |
| 22 | Q. | Any acquaintances or anyone more his age that wasn't |
| 23 | | treating him properly? |

| | | |
|---|---|---|
| 1 | A. | Not that I'm aware of. |
| 2 | Q. | Did he ever complain to you about anyone in |
| 3 | | particular? |
| 4 | A. | Never. |
| 5 | Q. | After this all occurred, ma'am, did you ever speak |
| 6 | | to people, like his coaches or his teachers or |
| 7 | | anything, to see if they observed anything unusual? |
| 8 | A. | Only time I spoke with them is -- so many people |
| 9 | | came to the wake.  I can't even tell you what I |
| 10 | | said.  I was in -- I don't remember a lot from that |
| 11 | | day. |
| 12 | Q. | Ma'am, did the family, you and your husband, incur |
| 13 | | funeral and burial expenses? |
| 14 | A. | Yes. |
| 15 | Q. | Do you know approximately how much that was? |
| 16 | A. | Twenty-three thousand dollars. |
| 17 | Q. | And what did that consist of? |
| 18 | A. | The funeral home, his plots, the stone, the church, |
| 19 | | and the funeral breakfast after. |
| 20 | Q. | Were those expenses paid by you or your husband? |
| 21 | A. | Both of us. |
| 22 | Q. | Did you ever have any conversations with anybody |
| 23 | | from the school district after your son passed away |

|  |  |  |
|---|---|---|
| 1 |  | that related back to this incident involving the |
| 2 |  | photo and the discipline that he received? |
| 3 | A. | I talked with everybody at the wake.  I don't know |
| 4 |  | what I said. |
| 5 | Q. | Anyone after the wake?  Did you reach out to the |
| 6 |  | school ever and talk -- |
| 7 | A. | Yes. |
| 8 | Q. | -- with the principal or anybody like that? |
| 9 | A. | I did.  I was going to sit down and talk with the |
| 10 |  | director of special ed, and then I came here and |
| 11 |  | then we canceled it. |
| 12 | Q. | Why is it that you were going to do that? |
| 13 | A. | To make changes. |
| 14 | Q. | Did you say to make changes? |
| 15 | A. | To make changes. |
| 16 | Q. | What did you have in mind, ma'am?  What changes? |
| 17 | A. | Something better than what my son went through. |
| 18 | Q. | And can you elaborate on it a little bit for us |
| 19 |  | specifically what you're referring to? |
| 20 | A. | Sure.  He had special needs.  Where was the special |
| 21 |  | ed teacher?  Where was everything?  I felt like I |
| 22 |  | did my part from day one, kindergarten, and I |
| 23 |  | followed through every meeting, everything, and we |

```
1              get up to this point, where is the Lancaster special
2         ed program when we need them, when we need backup
3         here?    I reached out to John Armstrong.  Where was
4         he?
5    Q.   Who's that?
6    A.   Director of special education for Lancaster.
7    Q.   And when you say where was he or where were they --
8    A.   Yeah.
9    Q.   -- when do you mean?
10   A.   In the principal's office when all this is going
11        down.
12   Q.   You mean when he was being questioned about it?
13   A.   Yeah.
14   Q.   Do you believe your son may have had a hard time
15        comprehending what was happening?
16   A.   Absolutely, yes.
17   Q.   And why do you believe that?
18   A.   Because I know it needs to be explained to him,
19        needs to be repeated back so you know he
20        understands, and the principal, from what I know,
21        didn't do that.
22   Q.   Did you or your husband ever attempt to do that?
23   A.   Always with ██████.
```

60



```
 1   Q.    I mean with regard to this incident.  In other
 2         words, say when he came home from school or anything
 3         like that, did you try to --
 4   A.    This was only the second time he's ever been in
 5         trouble, and I was going to do that with ▮▮▮
 6         after the boy left, and then when the boy left I
 7         looked for ▮▮▮, and that's when I couldn't find
 8         him.  In fact, I wasn't even going to let ▮▮▮ go
 9         back to that school.  I was going to home school him
10         until the high school.
11   Q.    Is there anything else about the manner in which the
12         situation was handled that you -- you were not
13         pleased with or thought was inappropriate?  So far
14         you've told me you're not certain that your son was
15         able to understand what was happening, you believe
16         that someone else, perhaps from special ed, should
17         have been there at the time.  Is there anything
18         else?
19   A.    I should have been notified first.  I should have
20         been in that room.  I should have signed a release
21         to go through his phone.
22   Q.    Anything else that you believe was handled
23         inappropriately by the principal or by the school
```

1      district regarding this particular incident?

2  A.   Just this incident or the one in March, too?

3  Q.   Let's talk about this one first, but we'll get back

4      to that one.  How about this one from May?

5  A.   For now, yeah.  That's it for May.

6  Q.   What about the March incident?

7  A.   The March, I should have had more information.  I

8      should have been included in on that conversation,

9      as well.  I feel the same way.  I feel that

10     somebody from special ed program should have been

11     with � representing him, and I should have been

12     called.  I should have known who those girls were.

13     Why wasn't I -- I should have been contacted in

14     October of 2015 or whenever that happened.

15  Q.   At any point either after the March situation or

16     after the May situation did you ever try to contact

17     anyone sort of above the principal, like speak to

18     the superintendent of the schools --

19  A.   Never.

20  Q.   -- or anything like that?

21  A.   No.

22  Q.   Did any of those folks ever reach out to you --

23  A.   No.

```
 1   Q.      -- or your husband?
 2   A.      No.
 3   Q.      Did you ever consider doing that, speaking to
 4           someone higher up the chain?
 5   A.      No.
 6   Q.      Had you ever had any contact at all with the school
 7           resource officer, the police officer --
 8   A.      No.
 9   Q.      -- either before or after?
10   A.      No.
11                   MR. CAVARELLO:  Okay, ma'am.  Those are all
12           the questions I have for you.  Thank you.
13                   THE WITNESS:  You're welcome.
14
15   EXAMINATION BY MS. APTER:
16
17   Q.      I just have some follow-up questions.
18   A.      Sure.
19   Q.      I'm Julie Apter.  I represent the Town of Lancaster.
20           Did ████████ have any type of jobs, like paper routes
21           or anything?
22   A.      He cut my mother's grass in the summer.
23   Q.      Okay.  Did she pay him?
```

**METSCHL & ASSOCIATES**
Buffalo: 716-856-1906   Rochester: 585-697-0969

63

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Okay. Was -- did the grass-cutting season start |
| 3 | | already right before May 6th? |
| 4 | A. | No. No. He was going to start cutting it after. |
| 5 | Q. | Did he cut grass for your mom like the year before? |
| 6 | A. | That's when it started, the year before, yeah. |
| 7 | Q. | Okay. How about winter; did he ever shovel |
| 8 | | driveways for anyone? |
| 9 | A. | No. He was too busy. |
| 10 | Q. | Okay. When he would cut grass for your mom do you |
| 11 | | know how much your mom paid him? |
| 12 | A. | Twenty dollars. |
| 13 | Q. | Did he -- was he allowed to keep the money for |
| 14 | | himself? |
| 15 | A. | Oh, absolutely. |
| 16 | Q. | Did he have a bank account? |
| 17 | A. | Yes, he did. |
| 18 | Q. | Okay. When he died was there money in the bank |
| 19 | | account? |
| 20 | A. | There was. |
| 21 | Q. | Do you know how much was in there? |
| 22 | A. | I believe it was two thousand. I transferred it to |
| 23 | | my daughter's account. |

```
 1   Q.    Did you or your husband have a life insurance policy
 2         on your son?
 3   A.    No.
 4   Q.    Did any type of insurance pay any of the funeral or
 5         burial expenses?
 6   A.    Nothing.
 7   Q.    I just want to -- when we were talking about his
 8         schooling you mentioned about the -- I believe the
 9         special ed instructors assigned to your son, and you
10         indicated at William Street it changed every year.
11         Was he at William Street more than two years?
12   A.    Yes.  Fourth, fifth and sixth.
13   Q.    And I said more than two years.  Other than fifth
14         and sixth did he have to stay longer?
15               MS. FAHEY:  She said fourth, fifth and
16         sixth.
17               MS. APTER:  Oh.  Fourth, fifth and sixth.
18         I'm sorry.
19               MS. FAHEY:  That's okay.
20   BY MS. APTER:
21   Q.    Okay.  Was he ever held back in any grade?
22   A.    No.
23   Q.    Have the police ever been called to your house for
```

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

```
 1           any issues with ████████?
 2    A.     No.
 3    Q.     And I understand you --
 4    A.     Oh, the police did come to my house over the -- that
 5           spring.  He was shooting his pucks, like I said, by
 6           the Christmas trees, and the neighbors thought he
 7           was stalking, casing their house, so a police
 8           officer came through our backyard and just said --
 9    Q.     When was this?
10    A.     Early March.
11    Q.     So the spring of 2016?
12    A.     Yeah.
13    Q.     Did anything come of that?
14    A.     No.  No.  It was just more he found -- the officer
15           found it funny.
16    Q.     Okay.  Did any other neighbors ever have any
17           complaints about ████████?
18    A.     No.
19    Q.     Did ████████ have any type of BB gun?
20    A.     Yes, he did.
21    Q.     Were there ever any complaints about him shooting BB
22           guns?
23    A.     Never used it, so no.
```

66

| | | |
|---|---|---|
| 1 | Q. | The incident around March when the police were |
| 2 | | called, did that have anything to do with the girls |
| 3 | | at school, that call in March? |
| 4 | A. | No.  It was a new neighbor that moved in.  They |
| 5 | | didn't know who ▓▓▓▓ was, so she thought it was -- |
| 6 | | he was very tall for his age and she thought it was |
| 7 | | a guy looking at her property, and he was just |
| 8 | | picking up his pucks and shooting some pucks, very |
| 9 | | innocent. |
| 10 | Q. | Okay.  Going back to the school resource officer, |
| 11 | | did you ever learn the name of the school resource |
| 12 | | officer? |
| 13 | A. | I didn't. |
| 14 | Q. | Did ▓▓▓▓ ever meet with a school resource officer |
| 15 | | at any time before May of 2016? |
| 16 | A. | Not that I'm aware of. |
| 17 | Q. | Was it your understanding that this incident in May |
| 18 | | was the one and only time a school resource officer |
| 19 | | was involved in a meeting? |
| 20 | A. | Yes. |
| 21 | Q. | I believe you testified that you were told the |
| 22 | | school resource officer was the one that deleted the |
| 23 | | pictures off the phone? |

| | | |
|---|---|---|
| 1 | A. | It was -- I wasn't told exactly.  It was either the |
| 2 | | principal or him.  I don't know which one for sure |
| 3 | | it was. |
| 4 | Q. | Okay.  Do you have any knowledge of any interaction |
| 5 | | that the school resource officer had with ████ |
| 6 | | during the meeting with the principal, other than |
| 7 | | his presence? |
| 8 | A. | I don't know. |
| 9 | Q. | Okay.  Is it your claim that the school resource |
| 10 | | officer harassed or threatened ██████ at all? |
| 11 | A. | I don't know, no. |
| 12 | Q. | So you really don't know, again, what happened, |
| 13 | | correct? |
| 14 | A. | I was told -- the principal used we, we went through |
| 15 | | his phone, we brought ██████ in.  I don't know what |
| 16 | | part he played. |
| 17 | Q. | Okay.  Was a police report ever made involving the |
| 18 | | pictures on the phone? |
| 19 | A. | I don't know. |
| 20 | Q. | Did anyone from Lancaster Police Department ever |
| 21 | | contact your family at any time about the meeting at |
| 22 | | the school? |
| 23 | A. | No. |

```
 1   Q.      Okay.  And had you ever seen any type of report that

 2           may have been prepared by the police department

 3           involving the May meeting at the school?

 4   A.      No.

 5   Q.      When school starts for the school year are there

 6           open houses that the parents can go to?

 7   A.      Yes.

 8   Q.      Do you know if you went to the open house for the

 9           2015-2016 school year?

10   A.      I went to seventh grade -- yes -- no.  We went in

11           for open house to bring Jordan's stuff in for his

12           locker, get his picture taken, but we didn't go to

13           the open house because we did it in seventh grade.

14   Q.      Does the school provide handbooks that they give to

15           students and parents involving policies at the

16           school?

17   A.      I believe so.

18   Q.      Do you know if you had the school policy or handbook

19           for the 2015-2016 school year?

20   A.      I don't know.

21   Q.      To your knowledge was there a school policy

22           involving students bringing cell phones into school?

23   A.      I don't know what the policy was.  I do know that
```

```
 1              ███████ was told to get a certain app for math on his
 2       phone, so we did.  We got him the phone so he could
 3       get this math app for school in seventh grade.
 4    Q.  Did the school send home any type of permission slip
 5       for students bringing phones into school?
 6    A.  No.
 7    Q.  Do you know who the math teacher was in seventh
 8       grade who required the app on the phone?
 9    A.  I could look it up.
10    Q.  I'm just asking if you know now.
11    A.  No.
12    Q.  Was this an app that could be downloaded to a
13       computer, to your knowledge?
14    A.  I don't know.
15    Q.  Had you ever seen this math app on your son's phone?
16    A.  No.
17    Q.  Did ███████ know how to download apps, to your
18       knowledge?
19    A.  Yes.
20    Q.  And did you ever see him using the phone for math
21       when he was in seventh grade?
22    A.  No.  He did all his work at school, and then
23       whatever he didn't do in the classroom he did in
```

METSCHL & ASSOCIATES
Buffalo: 716-856-1906   Rochester: 585-697-0969

| | | |
|---|---|---|
| 1 | | Miss Baker's room, so he never really brought |
| 2 | | anything home to do. |
| 3 | Q. | Okay.  I'm sorry.  You already testified who was |
| 4 | | ███████ pediatrician. |
| 5 | A. | Yes. |
| 6 | Q. | Dr. -- |
| 7 | A. | Dr. Dzik, D-Z-I-K.  There's a mister and missus.  He |
| 8 | | had the mister. |
| 9 | Q. | What was the name of the practice? |
| 10 | A. | Genesee Transit Pediatrics. |
| 11 | Q. | Okay.  Other than treating -- I mean seeing his |
| 12 | | pediatrician for routine visits was he under the |
| 13 | | care of any other physician for any other |
| 14 | | conditions? |
| 15 | A. | Well, he had been to Children's to the cardiac unit |
| 16 | | for an incident.  He almost passed out at school, |
| 17 | | and the nurse called me, so we took him in for an |
| 18 | | evaluation, but that was it. |
| 19 | Q. | When was that? |
| 20 | A. | February or March. |
| 21 | Q. | Of 2016? |
| 22 | A. | This year, yeah. |
| 23 | Q. | And you said he passed out at school? |

| | | |
|---|---|---|
| 1 | A. | He almost passed out.  It was due to lack of sodium. |
| 2 | Q. | Did he have any other health issues, to your |
| 3 | | knowledge? |
| 4 | A. | No. |
| 5 | Q. | You said it was due to lack of sodium? |
| 6 | A. | Yeah.  He was working out, drinking a lot of water, |
| 7 | | but he wasn't putting enough sodium back into his |
| 8 | | body, so that would cause him to feel lightheaded. |
| 9 | Q. | At the time of his death did you know his height and |
| 10 | | weight? |
| 11 | A. | Yeah, 'cause we keep it on the door and I just |
| 12 | | measured him.  He was five eleven and his weight |
| 13 | | roughly about a hundred forty-five pounds. |
| 14 | Q. | Was ▮▮▮▮ trying to lose weight around that period |
| 15 | | of time? |
| 16 | A. | No.  No.  He's actually been trying to gain.  He was |
| 17 | | just doing a lot with hockey and exercise. |
| 18 | Q. | Okay.  Was he doing well on the hockey team? |
| 19 | A. | Yeah.  He loved it. |
| 20 | | MS. APTER:  I think that's all I have. |
| 21 | | Thank you. |
| 22 | | MR. CAVARELLO:  I'm all set. |
| 23 | | MS. APTER:  I'm sorry.  Did you -- I know I |

METSCHL & ASSOCIATES
Buffalo: 716-856-1906    Rochester: 585-697-0969

1      asked about the school resource officer, but had you

2      ever discussed the incident in school with anyone

3      else at the Town of Lancaster, any type of official,

4      supervisor?

5            THE WITNESS:  Did I go in and talk with

6      somebody?

7            MS. APTER:  Or have you talked to anyone

8      from the Town of Lancaster about this?

9            THE WITNESS:  Just at the scene, the day of.

10           MS. APTER:  Okay.  All right.  That's all.

11     Thank you.

12           THE WITNESS:  Okay.

13         *　*　*　11:49 a.m. *　*　*

14

15

16

17

18

19

20

21

22

23

# LANCASTER CENTRAL SCHOOL DISTRICT CODE OF CONDUCT

# LANCASTER CENTRAL SCHOOL DISTRICT
# CODE OF CONDUCT

## Table of Contents

Introduction ................................................................................................................1

Definitions ................................................................................................................2

Student Rights and Responsibilities ........................................................................4

Essential Partners ....................................................................................................5

Student Dress Code/Civility ....................................................................................9

Student Conduct ......................................................................................................10

Reporting Violations ..............................................................................................15

Disciplinary Penalties, Procedures and Referrals ..................................................16

Alternative Instruction ............................................................................................24

Discipline of Students with Disabilities .................................................................24

Corporal Punishment/Emergency Interventions .....................................................28

Student Searches and Interrogations .......................................................................29

Visitors to the Schools ............................................................................................30

Public Conduct on School Property ........................................................................31

Dissemination and Review ......................................................................................33

## INTRODUCTION

The Lancaster Central School District Board of Education ("Board") is committed to providing a safe and orderly school environment where students may receive and District personnel may deliver quality educational services without disruption or interference. Responsible behavior by students, teachers, or other District personnel, parents and other visitors is essential to achieving this goal.

The District has a long-standing set of expectations for conduct on school property and at school functions. These expectations are based on the principles of civility, mutual respect, citizenship, character, tolerance, honesty and integrity. The Lancaster Central School District's mission statement and each individual school's mission statement reflect these principles. These include:

- *Lancaster Central School District's purpose* is to provide our students with a comprehensive educational program that will allow them to develop fully the necessary academic and social skills to become responsible and productive members of a democratic society.

- *The Como Park Elementary mission*:  To consistently offer many opportunities; this will be accomplished by positive environment which promotes achievement, respect for self and others and knowledge of how to interact with the world community in a caring, responsible way.

- *The Court Street Elementary mission:*  The faculty and staff at Court Street School are here to create a climate which will enable all students to develop to their fullest potential intellectually, emotionally and socially so that each child will become a well-adjusted, contributing member of society.

- *The Hillview Elementary mission:*  The mission of Hillview School is for the entire school community to provide a caring environment in which the whole child can achieve academic success, develop a love of learning and demonstrate respect for others.

- *The John A. Sciole mission:*  Teaching and learning for all, in a safe and orderly environment, with many varied educational opportunities, in a climate which includes high expectations for success.

- *The William Street School mission:*  We are a diverse group dedicated to providing leadership for excellence in education. Our purpose is to create a cohesive environment which nurtures and supports educational standards, individual potential and responsible citizenship.

- *The Lancaster Middle School mission:*  The *Lancaster* Middle School community is dedicated to providing a child-centered learning environment that will enable all students to become life-long productive members of society through the development of their physical, social and intellectual abilities, while respecting the rights, talents and individual differences of self and others.

- *The Lancaster High School mission:*   To revitalize the educational climate to promote achievement, respect and pride.

The Board recognizes the need to clearly define these expectations for acceptable conduct on school property, to identify the possible consequences of unacceptable conduct, and to ensure that discipline when necessary is administered promptly and fairly. To this end, the Board adopts this Code of Conduct ("Code").

Unless otherwise indicated, this Code applies to all students, school personnel, parents and other visitors when on school property or attending a school function.

## DEFINITIONS

For purposes of this Code, the following definitions apply:

**Acceptable Use Policy (or AUP)** refers to the Lancaster Central School District (LCSD) Policy #6410 -- Use of District Digital Telecommunication Access (DTA), LCSD Policy #6470 -- Acceptable Use Policy, applicable to all District Representatives, including all Employees, Contractors, Vendors, Affiliates; and LCSD Policy #7315 -- Student Use of Computerized Information Resources (Acceptable Use Policy) which is applicable to all District Students. The purpose of these respective AUP policies is to express the LCSD's philosophy and set forth the general principles governing the use of electronic media and services for District staff, students and others.

**Controlled substance** means a drug or other substance identified in certain provisions of the federal Controlled Substances Act specified in both federal and state law and regulations applicable to this policy.

**DASA** means Dignity for All Students Act. The goal of DASA is to provide public elementary and secondary school students with a safe and supportive learning environment free from discrimination, intimidation, taunting, harassment, and bullying on school property, on a school bus, or at a school function. In accordance with DASA, School District policy and practice must ensure that no student is subject to discrimination, harassment, or bullying based on a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, gender identity or sex by school employees or students.

**Disruptive student** means an elementary or secondary student under the age of twenty-one (21) who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.

**Harassment** means creating a hostile environment by conduct or by verbal threats, intimidation or abuse that unreasonably and substantially interferes with a student's educational performance, opportunities or benefits, or a student's mental, emotional or physical well-being. Harassment includes verbal threats, intimidation or abuse that may cause a student to fear for his or her physical safety and may include, but is not limited to, conduct, verbal threats, intimidation or abuse based on a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practice, disability, sexual orientation, gender, gender identity or sex.

**Illegal drug** means a controlled substance except for those legally possessed or used under the supervision of a licensed health-care professional or that is legally possessed or used under any other authority under the Controlled Substances Act or any other federal law. The inappropriate use or sharing of prescription and over-the-counter drugs shall also be disallowed.

**Parent** means parent, guardian or person in parental relation to a student.

**Plagiarism** means the use or close imitation of the language and ideas of another author and representation of them as one's own original work. This includes copying from electronic sources (from the World Wide Web), even with minor alterations.

**School community** means all Lancaster Central School District employees, students, parents and members of the Lancaster town community who have an interest in the School District.

**School function** means any school-sponsored event or activity, including those occurring off school grounds

**School property** means in or within any building, structure, athletic playing field, playground, parking lot or land contained within the real property boundary line of a public elementary or

secondary school, or in or on a school bus or school vehicle, as defined in Vehicle and Traffic Law Section 142.

**Serious bodily harm** means substantial risk of death; extreme physical pain; or obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ or faculty.

**Staff** means an employee of the Lancaster Central School District.

**Student with a disability** means a student with a disability as defined in Section 4401(I) of the Education Law, who has not attained the age of twenty-one (21) prior to September 1 and who is entitled to attend public schools pursuant to Section 3202 of the Education Law and who, because of mental, physical or emotional reasons, has been identified as having a disability and who requires special services and programs approved by the department. Commissioner's Regulation 200.1

**Violent student** means a student under the age of twenty-one (21) who:

1. Commits an act of violence upon a school employee, or attempts to do so.
2. Commits, while on school property or at a school function, an act of violence upon another student or any other person lawfully on school property or at the school function, or attempts to do so.
3. Possesses, while on school property or at a school function, a weapon.
4. Displays, while on school property or at a school function, what appears to be a weapon.
5. Threatens, while on school property or at a school function, to use a weapon.
6. Knowingly and intentionally damages or destroys the personal property of any school employee or any person lawfully on school property or at a school function.
7. Knowingly and intentionally damages or destroys District property.

**Visitor** means anyone who is not a regular staff member or student of the Lancaster Central School District including, but not limited to, contractors, vendors, affiliates, third-party partners or volunteers.

**Volunteers** are persons who donate their time and energies to assist Principals, teachers, and other school personnel in implementing various phases of school programs. Volunteers shall serve in that capacity without compensation or employee benefits except for liability protection under the District's insurance program.

**Weapon** means a "firearm" as defined in 18 USC Section 921 for purposes of the Gun-Free Schools Act. It also includes, but is not limited to, any other gun, BB gun, pellet gun, pistol, revolver, shotgun, rifle, machine gun, disguised gun, knife, dagger, dirk, razor, stiletto, switchblade knife, gravity knife, brass knuckles, sling shot, metal knuckle knife, box cutter, cane sword, electronic dart gun, Kung Fu star, electronic stun gun, pepper spray or other noxious spray, explosive or incendiary bomb, **or other device, instrument, material or substance that can cause physical injury or death when used to cause physical injury or death,** and any other instrument identified in Article 265 of the Penal Law of the State of New York as a weapon. **In addition, Lancaster's Code of Conduct further prohibits the possession or display of any toy, facsimile or replica of a weapon.**

**STUDENT RIGHTS AND RESPONSIBILITIES**

**With every right comes a responsibility:**

| RIGHTS | RESPONSIBILITIES |
|---|---|
| **1. Attend school and be granted the opportunity to receive a good education.** | **Attend school regularly and on time, complete assignments, and strive to do the highest quality work possible.** |
| **2. Be made aware of the school rules and policies, and to always be treated in a manner consistent with these policies in all disciplinary matters.** | **Be familiar with the Lancaster Code of Conduct, obey the rules it contains, conduct oneself in a manner not distracting to others.** |
| **3. Have the opportunity to present your version of the facts and circumstances in all disciplinary matters.** | **Be truthful and respectful when responding to authority.** |
| **4. Take part in all school activities on an equal basis regardless of race, color, creed, religion, sex, sexual orientation national origin, political affiliation, age, marital status, military status, or disability.** | **Work to one's best ability in all academic and extracurricular activities, while being fair and supportive of others.** |
| **5. Be safe in the school environment.** | **Behave in a manner that will not jeopardize the safety and well being of oneself or others.** |
| **6. Not to be intimidated**, harassed or subjected to discrimination based on actual or perceived race; color; weight; national origin; ethnic group; religion or religious practice; disability; sexual orientation; gender, gender identity; or sex; by employees or students on school property or at a school-sponsored event, function or activity. | **Respect one another and treat others fairly and in accordance with the Code of Conduct** and the provisions of the DASA. |
| **7. Dress according to personal taste.** | **Dress in a manner not distracting to others, and in accordance with school policy** and the Lancaster CSD Student Dress Code as expressed in this *Code of Conduct*. |

4

## ESSENTIAL PARTNERS

### Expectations for Parents:

1. ***Make certain your child's attendance at school is regular and punctual and all absences are properly excused,*** pursuant to the LCSD Policy #7110 -- <u>Comprehensive Student Attendance Policy</u> and *as required by law.*

2. Insist that your child is dressed in compliance with school rules regarding sanitation and safety and in a fashion that will not disrupt classroom procedures in accordance with this Code.

3. Be as certain as possible that your child is free of communicable disease and is in good health, enabling him or her to participate in the learning environment.

4. Teach your child, by word and example, respect for the law, for the authority of the school and for the rights and property of others.

5. Know and understand the rules your child is expected to observe. Be aware of the consequences for violations of these rules and accept legal responsibility for your child's actions.

6. Help your child understand that appropriate rules are required to maintain a safe, orderly environment and provide effective and appropriate strategies for dealing with peer pressure in accordance with the Lancaster Central School District Code of Conduct.

7. Instill in your child a desire to learn; encourage a respect for honest work and an interest in exploring broader fields of knowledge.

8. Become acquainted with your child's school, its staff, curriculum and activities. Attend parent-teacher conferences and school functions.

9. Convey to your child a supportive attitude toward education and the District.

10. Recognize that the education of your child is a joint responsibility of the parents and the school community.

11. Send your child to school ready to participate and learn as required by NY State law.

12. Promote positive behavior in your child by helping him or her to accept the consequences of his or her actions and by becoming involved in the behavior management/disciplinary process; guide your child to develop socially acceptable standards of behavior.

13. Inform school officials of changes in the home situation that may affect student conduct or performance.

14. Support your child educationally by providing a place for study and ensuring that homework assignments are completed.

15. Report any school-related safety concerns to a building administrator for resolution.

16. Agree to respect building specific requirements regarding security and safety. Parents will sign-in and present proper identification in accordance with building procedures.

### Expectations for Teachers:

1. Reflect a personal enthusiasm for teaching and learning while maintaining a genuine concern for the individual student.

2. Guide learning activities so students learn to think, reason, assume responsibility for their actions and respect the rights of others.

3. Be fair, firm and consistent in enforcing school rules on school property and at all school functions.

4. Give positive reinforcement for acceptable behavior.

5. Inform a counselor and/or administrator concerning any student whose behavior requires special attention.

6. Maintain a climate of mutual respect and dignity to strengthen each student's self-concept and confidence to learn.

7. Communicate to students and parents that which is important to the student's emotional, social, behavioral and academic progress, including but not limited to:

   a) Course objectives and requirements.

   b) Marking/grading procedures.

   c) Assignment deadlines.

   d) Expectations for students.

   e) Classroom discipline plan.

   f) Building-wide discipline plan.

   g) Student progress.

8. Be knowledgeable about and apply/put into practice effective classroom/building behavior management techniques and the non-violent crisis intervention philosophy and techniques.

9. Maintain confidentiality about all personal information and educational records concerning students and their families.

10. Demonstrate dependability, integrity, self-discipline and respect for law by word and personal example.

11. Report any school-related safety concerns to a building administrator.

12. Display proper school identification on their person and in view during the school day and at all job-related functions.

**Expectations for Student Support Service Personnel (including all Pupil Personnel Staff):**

1. Demonstrate interest and concern for student achievement in the educational process.

2. Know school policies and rules, including this Code of Conduct, and enforce them in a fair and consistent manner.

3. Maintain confidentiality about all personal information and educational records concerning students and their families.

4. Demonstrate dependability, integrity and other standards of ethical conduct.

5. Provide educationally related service(s) to support students in their educational program.

6. Support educational and academic goals.

7. Assist students in coping with peer pressure and emerging personal, social, emotional and physical problems.

8. Encourage students to benefit from the curriculum and co-curricular activities.

9. Communicate regularly with students, parents and other staff.

10. Be knowledgeable about and apply/put into practice effective classroom behavior/building management techniques and the non-violent crisis intervention philosophy and techniques.

11. Report any school-related safety concerns to a building administrator.

12. Display proper school identification on their person and in view during the school day and at all job-related functions.

**Expectations for Other School Staff:**

1. Follow the Code of Conduct; know, abide by and enforce school rules in a fair and consistent manner.

2. Set a good example for students and other staff by demonstrating dependability, integrity, respect and other standards of ethical conduct.

3. Assist in promoting a safe, orderly and stimulating school environment.

4. Maintain confidentiality about all personal information and educational records concerning staff, students and their families.

5. Report any school-related safety concerns to a building administrator.

6. Display proper school identification on their person and in view during the school day and at all job-related functions.

**Expectations for the Building Administrators:**

1. Organize school schedules and teaching assignments which promote effective classroom management and instruction.

2. Be fair, firm and consistent in all decisions affecting students, parents and staff.

3. Promote a successful teaching and learning environment by fostering a safe, orderly and academically stimulating school environment.

4. Ensure that students and staff have the opportunity to communicate regularly with the Building Principal regarding any school related matters.

5. Support the development of, and student participation in, appropriate extracurricular activities.

6. Be responsible for students, parents and staff knowing and understanding the Code of Conduct.

7. Be knowledgeable about and apply/put into practice effective classroom behavior/building management techniques, and the non-violent crisis intervention philosophy and techniques and assure their utilization in the building/discipline plan.

8. Ensure that a building-wide behavior management system is created, supported and enforced to meet the needs of students.

9. Maintain confidentiality about all personal information and educational records concerning students and their families.

10. Demonstrate by word and personal example dependability, integrity, self-discipline and respect for law.

11. Adhere to the District's administrative policies, regulations and procedures.

12. Display proper school identification on their person and in view during the school day and at all job-related functions.

13. Address and resolve any school-related safety concern reported by members of the school community.

**Expectations for the Superintendent and District Administrators:**

1. Promote a safe, orderly and academically stimulating school environment, supporting active teaching and learning.

2. Review with administrators the policies of the Board and state and federal laws relating to school operations and management.

3. Inform the Board about educational trends relating to student discipline.

4. Work to create instructional programs that are academically sound and promote an environment that is sensitive to student and teacher needs and is designed to minimize problems of student misconduct.

5. Work with administrators in enforcing the Code of Conduct and ensuring that all cases are resolved promptly and fairly.

6. Maintain confidentiality about all personal information and educational records concerning students and their families.

7. Demonstrate by word and personal example dependability, integrity, self discipline and respect for law.

8. Establish, implement and maintain programs for students with special needs in accordance with NY Education Law.

9. Be fair and consistent in making the final decisions regarding those students whose behavior problems have been appealed from individual schools to the Superintendent and Board of Education in accordance with District policy.

10. Become acquainted with the schools, staff and students by visiting buildings regularly and by attending school functions.

11. Display proper school identification on their person and in view during the school day and at all job-related functions.

**Expectations for Board of Education Members:**

1. Collaborate with student, teacher, administrator and parent organizations, school safety personnel and other school personnel to develop a Code of Conduct that clearly defines expectations for the conduct of students, personnel and visitors on school property and at school functions.

2. Approve and review at least annually the Lancaster Central School District Code of Conduct to evaluate the Code's effectiveness and the fairness and consistency of its implementation.

3. Lead by example by conducting Board meetings in a professional, respectful and courteous manner.

4. Become acquainted with the school, staff and students by visiting buildings and by attending school functions.

5. Display proper school identification on their person and in view during the school day and at all District-related functions.

## STUDENT DRESS CODE/CIVILITY

The Board of Education believes that appropriate dress and grooming contribute to a productive learning environment. All students are expected to give proper attention to personal cleanliness and to dress appropriately for school and school functions. Students and their parents have the primary responsibility for acceptable student dress and appearance in the school setting. Teachers and all other personnel should exemplify and reinforce acceptable student dress and help students develop an understanding of appropriate appearance in the school setting.

A student's dress, grooming and appearance shall:

1. Be safe, appropriate and not present a health or safety hazard to the student or others in the school.

2. Not create a distraction that interferes with the educational process. Examples will be included in respective building student handbooks.

3. Ensure that underwear is appropriately worn and covered with outer clothing.

4. Include footwear at all times. Footwear that is a safety hazard will not be allowed.

5. Not include headwear in the classroom except for a medical or religious purpose.

6. Not promote death, suicide, torture, Satanism, or occult.

7. Not represent membership in a gang that disrupts or threatens to disrupt the educational process.

8. Not include items that are sexually explicit, vulgar, obscene, libelous, or which denigrate others on account of race, color, weight, religion or religious practice, sex, sexual orientation, gender, gender identity, national origin, ethnic group, political affiliation, age, marital status, military status, or disability.

9

9. Not promote and/or endorse the use of alcohol, tobacco products, banned products, ~~or~~ illegal drugs, counterfeit and designer drugs, or paraphernalia for the use of such drugs and/or encourage other illegal or violent activities.

Each Building Principal or designee shall be responsible for informing all students and their parents of the student dress code at the beginning of the school year and whenever a revision to the dress code is made during the school year.

Students who violate the student dress code shall be required to modify their appearance by covering or removing the offending item and, if necessary or practical, replacing it with an acceptable item. Any student who refuses to do so shall be subject to discipline, up to and including school suspension. Any student who repeatedly fails to comply with the dress code shall be subject to further disciplinary action pursuant to the Code of Conduct.

**Appropriate Language/Respectful Behavior**

Students are expected to behave, and to treat all students, teachers, school staff and others, with honesty, tolerance, respect, courtesy and dignity as per the LCSD Policy #7552 -- <u>Bullying in the Schools</u>. Students should respect their peers, teachers, and school staff. Individual behavior should not interfere with the rights of others. Students are expected to use language that is appropriate in demonstrating respect for self and others. Profanity, vulgar language including, but not limited to, racial comments, and/or obscene gestures toward others will not be tolerated. Appropriate disciplinary action will be taken.


**STUDENT CONDUCT**

The primary goal of the Lancaster Central School District is to afford all students the opportunity to grow and develop both socially and intellectually to the best of their ability. The information herein has been designed to assist each student in realizing a rewarding academic experience at Lancaster.

The following is intended to serve as a guide for what is expected of all students attending the Lancaster Central School District. The adherence to school policies will promote proper student behavior and promote academic excellence. Any violation of these policies will result in appropriate disciplinary action. Specific levels will develop language under each category appropriate to their level.

The Board recognizes the need for specific and clear expectations for student conduct while on school property or engaged in a school function. The rules of conduct listed below are intended to do that and focus on safety and respect for the rights and property of others. Students who will not accept responsibility for their own behavior and who violate these school rules will be required to accept the penalties for their conduct.

Students may be subject to disciplinary action, up to and including suspension from school, when they:

1. Engage in conduct that is disorderly.

2. Engage in conduct that is insubordinate.

3. Engage in conduct that is disruptive.

4. Engage in conduct that is violent.

5. Engage in any conduct that endangers the safety, morals, health or welfare of others.

6. Engage in misconduct while on a school bus. It is crucial for students to behave appropriately while riding on owned or leased District buses to ensure their safety and that of other passengers and to avoid distracting the bus driver. Students are required to conduct themselves on the bus in a manner consistent with established standards for classroom behavior.

7. Engage in any form of academic misconduct.

8. Engage in any form of harassment, discrimination or bullying behavior. (All students are expected to comply with LCSD Policy #7552 -- <u>Bullying in the Schools</u>, in accordance with the provisions of DASA.)

Student handbooks in each building may address specific violations and subsequent consequences. The following are examples of, but not limited to, behavioral expectations of the students of the Lancaster Central School District:

<u>Attendance</u>

In accordance with Board policy (see LCSD Policy #7110 -- <u>Comprehensive Student Attendance Policy</u>), the impact of attendance upon instruction and on student learning and achievement on a regular and continuing basis is an important element in an effective teaching/learning program. Each and every student should attend classes on a regular basis and be a participant in the classroom programs, activities, and discussions. Because of the information being disseminated and because of the expectation of student participation, class attendance is important. Students' prolonged absences will result in a loss of instruction; therefore, attendance is imperative.

At such time as a student's lack of attendance is identified as a problem, every effort should be made to address the problem, utilizing the resources of the school and involving the student and his or her parents to resolve the attendance problem. The school resources include both teaching and administrative staff as well as guidance staff. When resources of the District have been exhausted and attendance patterns have not improved, other sources, including family court, may be appropriate in an attempt to correct the problem.

Students requesting early dismissal must complete the appropriate form.

<u>Buses</u>

Students are expected to be on time for their morning pickups. The same proper conduct is expected on a school bus as in a classroom. Any student whose behavior becomes a problem may lose transportation privileges. This loss does not release the student from the obligation to be in regular attendance. Students remaining after school must have a late bus pass or an honor pass to ride the late bus. No food or drink is to be consumed on buses at any time.

<u>Cafeteria</u>

All students must eat their lunch in the cafeteria whether they bring it from home or buy it, unless specifically granted permission to be exempted from this provision. Students must return their trays and deposit their garbage in the proper receptacles. Students are expected to conduct themselves in an orderly manner in the cafeteria. Any behavior in the cafeteria that violates the provisions in this Code will not be tolerated. Appropriate disciplinary action will follow.

<u>Computer/Internet Policy (Acceptable Use Policy)</u>

The District encourages students to use computers (including personally owned electronic devices as approved for educational purposes) and technology available in our school facilities; however, with this use comes responsibility. For a more detailed description of student computer and

Internet use rights and responsibilities refer to LCSD Policy #7315 -- <u>Student Use of Computerized Information Resources (Acceptable Use Policy)</u> and the accompanying Regulation #7315R.

Violations of the following guidelines may result in a loss of access as well as other disciplinary actions or legal action in accordance with applicable laws and/or due process procedures. Users are expected to:

**Respect the privacy of others:**

1. Users will not try to gain unauthorized access to networked or stand alone systems.

2. Users will not modify or read files of other individuals, however, it should be noted that system and/or District administrators have access to all files. **Privacy shall not be assumed in this case.**

**Respect the legal protection provided by copyright and license to programs and data:**

1. Users will not make copies of licensed programs, in violation of Copyright Laws.

2. Users will not install their own software on District computers without authorization.

3. Users will not intentionally develop or use programs to harass others or infiltrate a computing system or damage or alter the software components or network.

4. Users will not intentionally send inappropriate, obscene or hateful content to others by any electronic means, either on District-owned or personally-owned electronic devices.

5. Users will not be allowed access to various Internet sites including, but not limited to pornography, personal web sites or any online gambling site of any type.

<u>Corridor Passes</u>

While school is in session, no student is permitted in the halls or lavatories without a duly authorized pass. Students found without a pass will be subject to disciplinary measures.

Appropriate hallway behavior is expected, no running, shoving or any other inappropriate behaviors not conducive to the school environment.

<u>Dangerous Behavior/Weapons</u>

Any student who threatens or displays behavior that might endanger the health, safety and welfare of self, other students, teachers and/or staff, will be suspended immediately and may include a recommendation for a Superintendent's hearing to determine the student's future status. This behavior includes but is not limited to setting false fire alarms; making bomb threats; starting fires; possessing fireworks, weapon(s) or pepper spray; throwing objects; fighting; vandalism; extortion and any other activity that would endanger anyone on school property or at a school function.

<u>Fighting/Harassment</u>

All students of the Lancaster school community are to treat others with dignity and respect. Any student who engages in fighting/harassment/intimidation/bullying behavior (physical, sexual and/or verbal) will be displaying inappropriate behavior. Violators will be referred to the building administrator for disciplinary action. The penalty may range from a reprimand to suspension from school and/or bus.

## Forgery

Students who engage in forgery of any kind will be given the appropriate disciplinary action.

## Gambling/Selling/Trading of Items

Students observed participating in, or conducting any activity that may be construed as gambling will be disciplined appropriately. Exchanging of personal property is not conducive to the educational environment and those items may be confiscated and appropriate disciplinary measures will be taken.

## Medications

Students may not take and/or carry medications – prescription or over-the-counter – while in school unless the proper forms signed by both parent and doctor are submitted to the Nurse's Office.

## Insubordination

The appropriate disciplinary action will be taken when students are insubordinate, vulgar or display flagrant disregard of the school rules and disrespect for school personnel. This is to include, but is not limited to, completing assignments, following directions from adults and being prepared for class.

## Leaving School Building/Grounds

Students are not permitted to leave the school building or grounds at any time during the school day without a duly authorized pass from the Office. Students who become ill must be sent home through the Nurse's Office.

## Loitering/Trespassing

Unauthorized persons, including students, found loitering in the building or on school grounds will be referred to an administrator for disciplinary actions. The police will be contacted when necessary.

## Plagiarism/Cheating/Academic Dishonesty

Students are expected to take responsibility for their conduct in both their social and academic actions. Academic honesty requires that students turn in work that is their own and shows their best effort. Academic dishonesty includes cheating and plagiarism.

Plagiarism may include: lack of in-text documentation; not using quotation marks for direct quotes; paraphrasing and not giving credit; direct copying and submitting as the student's own work. Cheating may involve homework, projects, assignments, exams, quizzes or tests and may include: submitting work obtained or copied from another student or obtained from a teacher without permission; allowing another student to copy or obtain work; looking at another's test, answers or materials; copying another student's answers; talking or exchanging materials during the test period.

The following may be possible criminal offenses: accessing, deleting, modifying, transferring, or receiving computerized files without authorization from the teacher (this includes tampering with grades and attendance); using cellular phone technology or any mechanism with camera capabilities to photograph and/or quickly transmit copies of tests, projects or homework assignments without authorization from the teacher.

Students found to be plagiarizing or cheating on any assignment and/or test or examination may have a parent conference scheduled with the teacher as well as the school counselor (administrator if necessary). If warranted, the student will also receive a reduction in their grade or will receive a grade of zero on the assignment, project, quiz or test with **no** makeup offered. In addition, the student may

face suspension from clubs, sports or any other extra-curricular activity and/or criminal charges prosecutable under local, state and federal laws.

<u>Student Driving/Parking</u>

For students of driving age, driving to school is a privilege, not a right. Students are to arrive on time for school. Students who abuse the privilege will not be allowed to park on school property. Students must obey the posted speed limit and drive in a prudent, responsible manner. The school retains authority to conduct routine patrols of student parking lots and inspections of the exteriors and interiors of student automobiles while on school property. Suspension of driving privileges will be at the discretion of the school administrator. ATV's, snowmobiles, dirt bikes, etc. are not allowed on school grounds at any time.

Students must visibly display an appropriate parking permit at all times while on school property during the school day. Unauthorized and improperly parked vehicles will be ticketed.

<u>Student Use of Electronic Communication Devices</u>

Students shall be allowed to possess and use electronic communication devices during the school day, subject to building specific rules and procedures. While students are permitted to possess and use such devices during the school day, they are prohibited from using them in any manner which invades a person's privacy (for example, all electronic devices and cell phones are strictly prohibited in locker rooms at any time), disrupts the educational environment or endangers the safety of other students, employees, volunteers or visitors. If a student violates this provision, then he/she is subject to discipline under this and/or any other section of this *Code of Conduct* that may be applicable to the circumstances involved.

<u>Student Access to Inappropriate Content/Material and Use of Personal Technology or Electronic Devices</u>

1.  Despite the existence of District policy, regulations and guidelines, it is virtually impossible to completely prevent access to content or material that may be considered inappropriate for students. Students may have the ability to access such content or material from their home, other locations off school premises and/or with a student's own personal technology or electronic device on school grounds or at school events.

2.  The District is not responsible for inappropriate content or material accessed via a student's own personal technology or electronic device or via an unfiltered Internet connection received through a student's own personal technology or electronic device.

3.  Parents must be willing to establish boundaries and standards for the appropriate and acceptable use of technology and communicate these boundaries and standards to their children. The appropriate/acceptable use standards outlined District Policies #7315 -- <u>Student Use of Computerized Information Resources (Acceptable Use Policy)</u> and #8271 -- <u>Internet Safety/Internet Content Filtering Policy</u> and accompanying Regulations apply to student use of technology via the DCS or any other electronic media or communications, including by means of a student's own personal technology or electronic device on school grounds or at school events.

<u>Student Visitors</u>

Student visitors are welcome under certain conditions. The necessary paperwork must be completed well in advance of a visitation. There will be no visitations allowed on the week prior to exams or the day before a school holiday or school vacation.

Substance Use/Abuse (Including Tobacco Products)

Federal law and Board policy prohibits any type of substance use/abuse, including the use of tobacco, in any form on school property or at school functions.

The use of alcoholic beverages of any kind, as determined by law, is prohibited at all times on school property and at school functions. This includes all school-sponsored functions both on District property and away. Persons shall be banned from entering school property or school-sponsored events when exhibiting behavioral, personal or physical characteristics indicative of having used or consumed alcohol or illegal substances.

Students are prohibited from possessing, consuming, selling, attempting to sell, distributing or exchanging alcoholic beverages or illegal substances or being under the influence of either. Illegal substances include, but are not limited to, inhalants, marijuana, cocaine, LSD, PCP, heroin, look-alike drugs and drug paraphernalia. The inappropriate use or sharing of prescription and over-the-counter drugs including amphetamines and steroids shall also be prohibited.

Students with substance abuse or other social problems are encouraged to discuss them with appropriate school personnel. Problems will be treated in the strictest confidence possible.

Tardy to School

Appropriate notification from a parent/guardian must be received by the Attendance Office if a student is late to school.

Theft/Possession of Stolen Property

Disciplinary action will be taken against students that steal, or are in possession of, any property that does not belong to them.

Vandalism

Vandalism of school property is considered a serious offense. This can range from littering to destruction of school property. Students will be assessed for damages of loss of any school property or equipment for which they are responsible. In accordance with law, students and/or parents may be responsible for the cost of recouping damages. In addition, disciplinary action may be taken.

Vulgarity/Profanity

The use of vulgarity/profanity in the school building, on school grounds, on a school bus, or at any school-sponsored function, is strictly prohibited. This includes selling, using or possessing obscene materials. All locker decorations should reflect this policy.


**REPORTING VIOLATIONS**

All students are expected to promptly report violations of the Code of Conduct to a teacher, guidance counselor, the Building Principal or his/her designee. Any student observing a student possessing a weapon, alcohol or illegal substance on school property (including a school bus), or at a school function shall report this information immediately to a teacher, the Building Administrator, any other school staff member, the Principal's designee or the Superintendent.

All District staff, who are authorized to impose disciplinary sanctions, are expected to do so in a prompt, fair and lawful manner. District staff who are not authorized to impose disciplinary sanctions are expected to promptly report violations of the Code of Conduct to their supervisor, who shall in turn

impose an appropriate disciplinary sanction, if so authorized, or refer the matter to a staff member who is authorized to impose an appropriate sanction.

Any weapon, alcohol, illegal substance, or banned product found shall be confiscated immediately, if possible, followed by notification to the parent of the student involved and the appropriate disciplinary sanction, if warranted, which may include permanent suspension and referral for prosecution.

The Building Administrator or his/her designee must notify the appropriate local law enforcement agency of those Code violations that constitute a crime and substantially affect the order or security of a school as soon as practical, but in no event later than the close of business the day the Principal or his or her designee learns of the violation. The notification may be made by telephone, followed by a letter mailed on the same day as the telephone call is made. The notification must identify the student and explain the conduct that violated the Code of Conduct and that constituted a crime.

## DISCIPLINARY PENALTIES, PROCEDURES AND REFERRALS

Disciplinary action, when necessary, will be firm, fair and consistent so as to be the most effective in changing student behavior. In determining the appropriate disciplinary actions, school personnel authorized to impose disciplinary penalties will consider the following:

1. The student's age.

2. The nature of the offense and the circumstances which led to the offense.

3. The student's prior disciplinary record.

4. The effectiveness of other forms of discipline.

5. Information from parents, teachers and/or others, as appropriate.

6. Other extenuating circumstances.

As a general rule, discipline will be progressive. This means that a student's first violation will usually merit a lighter penalty than subsequent violations.

If the conduct of a student is related to a disability or suspected disability, the student shall be referred to the Committee on Special Education and discipline, if warranted, shall be administered consistent with the separate requirements of this Code of Conduct for disciplining students with a disability or presumed to have a disability.

### Penalties

Students who are found to have violated the District's Code of Conduct may be subject to the following penalties, either alone or in combination. The school personnel identified after each penalty are authorized to impose that penalty, consistent with the student's right to due process.

1. Oral warning – any member of the District staff.

2. Written warning – bus drivers, hall and lunch monitors, coaches, school counselors, teachers, Principal, Superintendent.

3. Notification to parent (telephone, email or letter) - school counselors, teachers, administrator.

4.     Detention (as per building procedures) – teachers, Principal, Superintendent.

5.     Suspension from transportation – Principal, Superintendent.

6.     Suspension from athletic participation – coaches, Principal, Superintendent.

7.     Suspension from social or extracurricular activities – activity director, Principal, Superintendent.

8.     Suspension of other privileges – Principal, Superintendent.

9.     Removal from classroom by teacher – teachers, Principal.

10.    In-school suspension – Principal, Superintendent.

11.    Short-term (five days or less) suspension from school – Principal, Superintendent, Board of Education.

12.    Long-term (more than five days) suspension from school – Superintendent, Board of Education.

13.    Permanent suspension from school – Superintendent, Board of Education.

## Procedures

The amount of due process a student is entitled to receive before a penalty is imposed depends on the penalty being imposed. In all cases, regardless of the penalty imposed, the school personnel authorized to impose the penalty must inform the student of the alleged misconduct and must investigate, to the extent necessary, the facts surrounding the alleged misconduct. All students will have an opportunity to present their version of the facts to the school personnel imposing the disciplinary penalty in connection with the imposition of the penalty.

Students who are to be given penalties other than an oral warning, written warning or written notification to their parents are entitled to additional rights before the penalty is imposed. These additional rights are explained below.

<u>Detention</u>

Teachers, Principals and the Superintendent may use after school detention as a penalty for student misconduct in situations where removal from the classroom or suspension would be inappropriate.

<u>Suspension from Transportation</u>

If a student does not conduct himself/herself properly on a bus, the bus driver is expected to bring such misconduct to the attention of the appropriate supervisor. Students who become a serious disciplinary problem may have their riding privileges suspended by the Building Principal or the Superintendent or their designees. In such cases, the student's parent will become responsible for seeing that his or her child gets to and from school safely. Should the suspension from transportation amount to a suspension from attendance, the District will make appropriate arrangements to provide for the student's education.

A student subjected to a suspension from transportation is not entitled to a full hearing pursuant to Education Law Section 3214. However, the student and the student's parent will be provided with a

reasonable opportunity for an informal conference with the Building Principal or the Principal's designee to discuss the conduct and the penalty involved.

<u>Suspension from Athletic Participation, Extra-curricular Activities and Denial of other Privileges</u>

Students are expected to abide by the District's Athletic Code of Conduct, training rules and other rules applicable to students participating in athletics or extracurricular activities.

A student subjected to a suspension from athletic participation, extracurricular activities or other privileges is not entitled to a full hearing pursuant to Education Law Section 3214. However, the student and the student's parent will be provided with a reasonable opportunity for an informal conference with a District official to discuss the conduct and the penalty involved.

<u>Teacher Disciplinary Removal of Disruptive Students</u>

A student's behavior can affect a teacher's ability to teach and can make it difficult for other students in the classroom to learn. In most instances, the classroom teacher can control a student's behavior and maintain or restore control over the classroom by using good classroom management techniques. Time-honored classroom management techniques do not constitute disciplinary removals for purposes of this Code as long as the management technique does not transfer student care/custody from the teachers.

On occasion, a student's behavior may become disruptive. For purposes of this Code of Conduct, a disruptive student is a student who is substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom. A substantial disruption of the educational process or substantial interference with a teacher's authority occurs when a student demonstrates a persistent unwillingness to comply with the teacher's instructions or repeatedly violates the teacher's classroom behavior rules.

A classroom teacher may remove a disruptive student from class for up to two (2) days. The removal from class applies to the class of the removing teacher only.

Any disruptive student removed from the classroom by the classroom teacher shall be offered continued educational programming and activities at a designated "time-out" place with a certified teacher as determined by each building.

Each teacher must keep a complete log (on a District provided form) for all cases of removal of students from his or her class. The Principal must keep a log of all removals of students from class.

Removal of a student with a disability, under certain circumstances, may constitute a change in the student's placement. Accordingly, no teacher may remove a student with a disability from his or her class until he or she has verified with the Principal or the chairperson of the Committee on Special Education that the removal will not violate the student's rights under state or federal law or regulation.

*The procedure for the removal of a student by a teacher is as follows (see flow chart, following page):*

# TEACHER RESPONSIBILITIES WHEN REMOVING DISRUPTIVE STUDENT



Is student "disruptive" as defined in SAVE Act? (A student, under age 21, who is "substantially disruptive of the educational process or substantially interferes with the teacher's authority over the classroom.")

**NO** → Disciplinary measures as identified in classroom/building discipline plans

**YES**

Does student's conduct pose continuing danger or an ongoing threat of disruption to the academic process?

**YES**
1) Contact main office for assistance.
2) Explain to student reason for removal and allow opportunity to be heard within 24 hours.
3) Student is escorted from room.

**NO**
1) Before removing, explain reason for removal; allow student to informally present his/her version of events
2) Student is escorted to designated site.

1) Inform Principal of reasons for removal and complete District form.
2) Provide continued educational programming and activities.
3) Complete entry in removal log.
4) May be required to meet with parent, student and administrator.

# PRINCIPAL'S RESPONSIBILITIES TRIGGERED BY TEACHER REMOVAL

1) Within 24 hours* of removal, **Principal** or his/her designee must inform parent of reasons for removal.
2) **On request**, student/parent must be given an opportunity to discuss reasons with Principal.
3) If student denies the charges, student/parent must be given explanation of basis for removal and an opportunity to present his/her version. This must take place within 48 hours* of removal.
4) Principal must decide, by the close of the business on the day following the opportunity for the informal hearing, whether the discipline will be overturned. Principal may only set aside discipline if:
   a. The charges against the student are not supported by **substantial evidence**.
   b. The student's removal is in violation of law.
   c. The conduct warrants suspension and a suspension will be imposed.

*If such a time period does not end on a school day, it shall be extended to the corresponding time on the next school day.

## In-School Suspension

The Board recognizes the school must balance the need of students to attend school and the need for order in the classroom to establish an environment conducive to learning. As such, the Board authorizes Building Principals and the Superintendent to place students who would otherwise be suspended from school as the result of a Code of Conduct violation in "in-school suspension."

A student subjected to an in-school suspension is <u>not</u> entitled to a full hearing pursuant to Education Law Section 3214. However, the student and the student's parent will be provided with a reasonable opportunity for an informal conference with the District official imposing the in-school suspension to discuss the conduct and the penalty involved.

## Suspension from School

Suspension from school is a severe penalty, which may be imposed only upon students who are insubordinate, disorderly, violent or disruptive, or whose conduct otherwise endangers the safety, morals, health or welfare of others.

The Board retains its authority to suspend students, but places primary responsibility for the suspension of students with the Superintendent and the Building Principals.

Any staff member may recommend to the Superintendent or the Principal that a student be suspended. All staff members must immediately report and refer a violent student to the Principal or the Superintendent for a violation of the Code of Conduct. All recommendations and referrals shall be made in writing unless the conditions underlying the recommendation or referral warrant immediate attention. In such cases a written report is to be prepared as soon as possible by the staff member recommending the suspension.

The Superintendent or Principal, upon receiving a recommendation or referral for suspension or when processing a case for suspension, shall gather the facts relevant to the matter and record them for subsequent presentation, if necessary.

1.  Short-term (5 days or Less) Suspension from School

When the Superintendent or Principal proposes to suspend a student charged with misconduct for five (5) days or less pursuant to Education Law Section 3214(3), the suspending authority must immediately notify the student orally. If the student denies the misconduct, the suspending authority must provide an explanation of the basis for the proposed suspension. The suspending authority must also notify the student's parents in writing that the student may be suspended from school. The written notice must be provided by personal delivery, express mail delivery, or by some other means that is reasonably calculated to assure receipt of the notice within twenty-four (24) hours of the decision to propose suspension at the last known address for the parents. Where possible, notice should also be provided by telephone if the school has been provided with a telephone number(s) for the purpose of contacting the parents.

The notice shall provide a description of the charges against the student and the incident for which suspension is proposed and shall inform the parent of the right to request an immediate informal conference with the Principal. Both the notice and informal conference shall be in the dominant language or mode of communication used by the parent. At the conference, the parent shall be permitted to ask questions of complaining witnesses under such procedures as the Principal may establish.

The notice and opportunity for an informal conference shall take place <u>before</u> the student is suspended <u>unless</u> the student's presence in school poses a continuing danger to persons or property or an ongoing threat of disruption to the academic process. If the student's presence

does pose such a danger or threat of disruption, the notice and opportunity for an informal conference shall take place as soon after the suspension as is reasonably practicable.

After the conference, the Principal shall promptly advise the parents in writing of his or her decision. The Principal shall advise the parents that if they are not satisfied with the decision and wish to pursue the matter, they must file a written appeal to the Superintendent within five business days, unless they can show extraordinary circumstances precluding them from doing so. The Superintendent shall issue a written decision regarding the appeal within ten (10) business days of receiving the appeal. If the parents are not satisfied with the Superintendent's decision, they must file a written appeal to the Board of Education with the District clerk within ten (10) business days of the date of the Superintendent's decision, unless they can show extraordinary circumstances precluding them from doing so. Only final decisions of the Board may be appealed to the Commissioner within thirty (30) days of the decision.

2.     Long-term (More than 5 Days) Suspension from School

When the Superintendent determines that a suspension for more than five (5) days may be warranted, he or she shall give reasonable notice to the student and the student's parents of their right to a fair hearing. At the hearing the student shall have the right to be represented by counsel, the right to question witnesses against him or her and the right to present witnesses and other evidence on his or her behalf.

The Superintendent shall personally hear and determine the proceeding or may, in his or her discretion, designate a hearing officer to conduct the hearing. The hearing officer shall be authorized to administer oaths and to issue subpoenas in conjunction with the proceeding before him or her. A record of the hearing shall be maintained, but no stenographic transcript shall be requested. A tape recording shall be deemed a satisfactory record. The hearing officer shall make findings of facts and recommendations as to the appropriate measure of discipline to the Superintendent. The report of the hearing officer shall be advisory only, and the Superintendent may accept all or any part thereof.

An appeal of the decision of the Superintendent may be made to the Board that will make its decision based solely upon the record before it. All appeals to the Board must be in writing and submitted to the District clerk within ten (10) business days of the date of the Superintendent's decision, unless the parents can show that extraordinary circumstances precluded them from doing so. The Board may adopt in whole or in part the decision of the Superintendent. Final decisions of the Board may be appealed to the Commissioner within thirty (30) days of the decision.

<u>Permanent Suspension</u>

Permanent suspension is reserved for extraordinary circumstances such as where a student's conduct poses a life-threatening danger to the safety and well-being of other students, school personnel or any other person lawfully on school property or attending a school function.

<u>Students who Bring or Possess a "Firearm" on School Premises</u>

Any student found guilty of bringing or possessing a "firearm" (as defined in federal law) on school property will be subject to suspension from school for at least one (1) calendar year. School premises include school buildings and grounds, District vehicles, school settings and/or school sponsored activities under the control and supervision of the District regardless of location,

Before being suspended, the student will have an opportunity for a hearing pursuant to Education Law Section 3214.

The Superintendent has the authority to modify the one-year suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the following:

1. The student's age.

2. The student's grade in school.

3. The student's prior disciplinary record.

4. The Superintendent's belief that other forms of discipline may be more effective.

5. Input from parents, teachers and/or others.

6. Other extenuating circumstances.

A student with a disability may be suspended only in accordance with the requirements of state and federal law.

<u>Students who Commit Violent Acts Other Than Bringing a "Firearm" to School</u>

Any student who is found to have committed a violent act, other than bringing or possessing a "firearm" on school property, shall be subject to suspension from school for at least five (5) days. If the proposed penalty is the minimum five-day suspension, the student and the student's parents will be given the same notice and opportunity for an informal conference given to all students subject to a short-term suspension.

If the proposed penalty exceeds the minimum five-day suspension, the student and the student's parents will be given the same notice and opportunity for a hearing given to all students subject to a long-term suspension.

The Superintendent has the authority to modify the minimum five-day suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the same factors considered in modifying a one-year suspension for possessing a "firearm".

<u>Students Who are Repeatedly Substantially Disruptive of the Educational Process or Repeatedly Substantially Interfere with the Teacher's Authority over the Classroom</u>

Any student, who repeatedly is substantially disruptive of the education process or substantially interferes with the teacher's authority over the classroom, will be suspended from school for at least five days. For the purposes of this Code of Conduct, "repeatedly substantially disruptive" means engaging in conduct that results in the student being removed from the classroom by teacher(s) pursuant to Education Law Section 3214(3-a) and this Code on four or more occasions during a semester.

If the proposed penalty is the minimum five-day suspension, the student and the student's parent will be given the same notice and opportunity for an informal conference given to all students subject to a short-term suspension. If the proposed penalty exceeds the minimum five-day suspension the student and the student's parent will be given the same notice and opportunity for a hearing given to all students subject to a long-term suspension. The Superintendent has the authority to modify the minimum five-day suspension on a case-by-case basis. In deciding whether to modify the penalty, the Superintendent may consider the same factors considered in modifying a one-year suspension for possessing a "firearm".

**Referrals**

## Counseling

It is expected that most inappropriate student behavior in the classroom will be addressed by the teacher in accordance with the teacher's individual discipline plan.

When a student has been repeatedly substantially disruptive and removed from class four times, a referral shall be made to the student's school counselor by the teacher, administrator or the Student Support Team using the appropriate referral form.

Counseling interventions by the School Counselor (Social Worker at the elementary level) may include but are not limited to:

1. Contacting parent.

2. Meeting with student.

3. Referring to the Family Support Center or appropriate agency.

4. Arranging parent conference.

5. Requiring weekly progress reports.

6. Referring to School Social Worker.

7. Referring to School Psychologist.

Should these counseling interventions fail the parent will be made aware that further disruption may result in out-of-school suspension.

## PINS Petition

The District may file a PINS (person in need of supervision) petition in Family Court per Article 7 of the Family Court Act on any student under the age of eighteen (18) who demonstrates that he or she requires supervision and treatment by:

1. Being habitually truant and not attending school as required by Part 1 of Article 65 of the Education Law.

2. Engaging in an ongoing or continual course of conduct which makes the student ungovernable or habitually disobedient and beyond the lawful control of the school.

3. Knowingly and unlawfully possesses marijuana in violation of Penal Law 221.05. A single violation of 221.05 will be sufficient basis for filing a PINS petition.

## Juvenile Delinquents and Juvenile Offenders

1. Any student under the age of sixteen (16) who is found to have brought a weapon to school, per Section 265.05 of the Penal Law of the State of New York; or

2. Any student thirteen (13), fourteen (14) or fifteen (15) years old who is criminally responsible for acts as a "juvenile offender" under the provisions of Criminal Procedure Law Section 1.20(42).

## ALTERNATIVE INSTRUCTION

When a student of any age is removed from class by a teacher for disruptive behavior, or a student of compulsory attendance age is suspended from school pursuant to Education Law 3214, the District will take immediate steps to provide alternative means of instruction for the student. This instruction shall be of an equivalent nature to that provided in the student's regularly scheduled class and shall be provided by a certified teacher. The District shall act promptly, with due regard for the nature and circumstance of the particular case.

## DISCIPLINE OF STUDENTS WITH DISABILITIES

The Board recognizes that it may be necessary to suspend, remove or otherwise discipline students with disabilities to address disruptive or problem behavior. The Board also recognizes that students with disabilities enjoy certain procedural protections whenever school authorities intend to impose discipline upon them. The Board is committed to ensuring that the procedures followed for suspending, removing or otherwise disciplining students with disabilities are consistent with the procedural safeguards required by applicable laws and regulations.

This Code of Conduct affords students with disabilities subject to disciplinary action no greater or lesser rights than those expressly afforded by applicable federal and state law and regulations.

### Authorized Suspensions or Removals of Students with Disabilities

1. For purposes of this section of the Code of Conduct, the following definitions apply.

   a) A "suspension" means a suspension pursuant to Education Law Section 3214.

   b) A "removal" means a removal for disciplinary reasons from the student's current educational placement other than a suspension and change in placement to an interim alternative educational setting (IAES) ordered by an impartial hearing officer because the student poses a risk of harm to himself or herself or others.

   c) An "IAES" means a temporary educational placement for a period of up to forty-five (45) school days, other than the student's current placement at the time the behavior precipitating the IAES placement occurred, that enables the student to continue to progress in the general curriculum, although in another setting, to continue to receive those services and modifications, including those described on the student's current individualized education program (IEP), that will enable the student to meet the goals set out in such IEP, and include services and modifications to address the behavior which precipitated the IAES placement that are designed to prevent the behavior from recurring.

2. School personnel may order the suspension or removal of a student with a disability from his or her current educational placement as follows:

   a) The Board, the District (BOCES) Superintendent of schools or a Building Principal may order the placement of a student with a disability into an IAES, another setting or suspension for a period not to exceed five consecutive school days and not to exceed the amount of time a non-disabled student would be subject to suspension for the same behavior.

   b) The Superintendent may order the placement of a student with a disability into an IAES, another setting or suspension for up to ten (10) consecutive school days, inclusive of any period in which the student has been suspended or removed under subparagraph (a) above for the same behavior, if the Superintendent determines that the student has engaged in behavior that warrants a suspension and the suspension or removal does not exceed the

amount of time non-disabled students would be subject to suspension for the same behavior.

c) The Superintendent may order additional suspensions of not more than ten (10) consecutive school days in the same school year for separate incidents of misconduct, as long as those removals do not constitute a change of placement.

d) The Superintendent may order the placement of a student with a disability in an IAES to be determined by the committee on special education (CSE), for the same amount of time that a student without a disability would be subject to discipline, but not more than forty-five (45) school days, if the student carries a weapon to or possesses a weapon at school or a school function, or the student knowingly possesses or uses illegal drugs or sells or solicits the sale of a controlled substance while at school or a school function, or the student has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function. "Serious bodily harm" means substantial risk of death; extreme physical pain; or obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ or faculty.

e) Subject to specified conditions required by both federal and state law and regulations, an impartial hearing officer may order the placement of a student with a disability in an IAES setting for up to forty-five (45) school days at a time, if maintaining the student in his or her current educational placement poses a risk of harm to the student or others.

**Change of Placement Rule**

1. A disciplinary change in placement means a suspension or removal from a student's current educational placement that is either:

   a) For more than ten (10) consecutive school days; or

   b) For a period of ten (10) consecutive school days or less if the student is subjected to a series of suspensions or removals that constitute a pattern because they cumulate to more than ten (10) school days in a school year and because of such factors as the length of each suspension or removal, the total amount of time the student is removed and the proximity of the suspensions or removals to one another.

2. School personnel may not suspend or remove a student with disabilities if imposition of the suspension or removal would result in a disciplinary change in placement based on a pattern of suspension or removal.

   However, the District may impose a suspension or removal, which would otherwise result in a disciplinary change in placement, based on a pattern of suspensions or removals if the CSE has determined that the behavior was <u>not</u> a manifestation of the student's disability, or the student is placed in an IAES for behavior involving weapons, illegal drugs or controlled substances, or for inflicting serious bodily harm.

**Special Rules Regarding the Suspension or Removal of Students with Disabilities**

1. The District's Committee on Special Education shall:

   a) Conduct functional behavioral assessments to determine why a student engages in a particular behavior, and develop or review behavioral intervention plans whenever the District is first suspending or removing a student with a disability for more than ten (10) school days in a school year or imposing a suspension or removal that constitutes a disciplinary change in placement, including a change in placement to an IAES for misconduct involving weapons, illegal drugs or controlled substances.

If subsequently, a student with a disability who has a behavioral intervention plan and who has been suspended or removed from his or her current educational placement for more than ten (10) school days in a school year is subjected to a suspension or removal that does not constitute a disciplinary change in placement, the members of the CSE shall review the behavioral intervention plan and its implementation to determine if modifications are necessary.

If one or more members of the CSE believe that modifications are needed, the School District shall convene a meeting of the CSE to modify such plan and its implementation, to the extent the committee determines necessary.

b) Conduct a manifestation determination review of the relationship between the student's disability and the behavior subject to disciplinary action whenever a decision is made to place a student in an IAES either for misconduct involving weapons, illegal drugs or controlled substances or because maintaining the student in his current educational setting poses a risk of harm to the student or others; or a decision is made to impose a suspension that constitutes a disciplinary change in placement.

2. The parents of a student who is facing disciplinary action, but who has not been determined to be eligible for services under IDEA and Article 89 at the time of misconduct, shall have the right to invoke applicable procedural safeguards set forth in federal and state law and regulations if, in accordance with federal and state statutory and regulatory criteria, the School District is deemed to have had knowledge that their child was a student with a disability before the behavior precipitating disciplinary action occurred. If the District is deemed to have had such knowledge, the student will be considered a student presumed to have a disability for discipline purposes.

a) The Superintendent, Building Principal or other school official imposing a suspension or removal shall be responsible for determining whether the student is a student presumed to have a disability.

b) A student will not be considered a student presumed to have a disability for discipline purposes if, upon receipt of information supporting a claim that the District had knowledge the student was a student with a disability, the District either:

(1) Conducted an individual evaluation and determined that the student is not a student with a disability, or

(2) Determined that an evaluation was not necessary and provided notice to the parents of such determination, in the manner required by applicable law and regulations.

If there is no basis for knowledge that the student is a student with a disability prior to taking disciplinary measures against the student, the student may be subjected to the same disciplinary measures as any other non-disabled student who engaged in comparable behaviors.

However, if a request for an individual evaluation is made while such non-disabled student is subjected to a disciplinary removal, an expedited evaluation shall be conducted and completed in the manner prescribed by applicable federal and state law and regulations. Until the expedited evaluation is completed, the non-disabled student who is not a student presumed to have a disability for discipline purposes shall remain in the educational placement determined by the District, which can include suspension.

3. The District shall provide parents with notice of disciplinary removal no later than the date on which a decision is made to change the placement of a student with a disability to an IAES for either misconduct involving weapons, illegal drugs or controlled substances or because maintaining the student in his/her current educational setting poses a risk of harm to the student

or others; or a decision is made to impose a suspension or removal that constitutes a disciplinary change in placement.

The procedural safeguards notice prescribed by the Commissioner shall accompany the notice of disciplinary removal.

4. The parents of a student with disabilities subject to a suspension of five consecutive school days or less shall be provided with the same opportunity for an informal conference available to parents of non-disabled students under the Education Law.

5. Superintendent hearings on disciplinary charges against students with disabilities subject to a suspension of more than five school days shall be bifurcated into a guilt phase and a penalty phase in accordance with the procedures set forth in the Commissioner's regulations incorporated into this Code.

6. The removal of a student with disabilities other than a suspension or placement in an IAES shall be conducted in accordance with the due process procedures applicable to such removals of non-disabled students, except that school personnel may not impose such removal for more than 10 consecutive days or for a period that would result in a disciplinary change in placement, unless the CSE has determined that the behavior is not a manifestation of the student's disability.

7. During any period of suspension or removal, including placement in an IAES, students with disabilities shall be provided services as required by the Commissioner's regulations incorporated into this Code.

**Expedited Due Process Hearings**

1. An expedited due process hearing shall be conducted in the manner specified by the Commissioner's regulations incorporated into this Code, if:

   a) The District requests such a hearing to obtain an order of an impartial hearing officer placing a student with a disability in an IAES where school personnel maintain that it is dangerous for the student to be in his or her current educational placement, or during the pendency of due process hearings where school personnel maintain that it is dangerous for the student to be in his or her current educational placement during such proceedings.

   b) The parent requests such a hearing from a determination that the student's behavior was not a manifestation of the student's disability, or relating to any decision regarding placement, including but not limited to any decision to place the student in an IAES.

      (1) During the pendency of an expedited due process hearing or appeal regarding the placement of a student in an IAES for behavior involving weapons, illegal drugs or controlled substances, or on grounds of dangerousness, or regarding a determination that the behavior is not a manifestation of the student's disability for a student who has been placed in an IAES, the student shall remain in the IAES pending the decision of the impartial hearing officer or until expiration of the IAES placement, whichever occurs first, unless the parents and the District agree otherwise.

      (2) If school personnel propose to change the student's placement after expiration of an IAES placement, during the pendency of any proceeding to challenge the proposed change in placement, the student shall remain in the placement prior to removal to the IAES, except where the student is again placed in an IAES.

2. An expedited due process hearing shall be completed within fifteen (15) business days of receipt of the request for a hearing. Although the impartial hearing officer may grant specific extensions of such time period, he or she must mail a written decision to the District and the parents within

five (5) business days after the last hearing date, and in no event later than forty-five (45) calendar days after receipt of the request for a hearing, without exceptions or extensions.

**Referral to law enforcement and judicial authorities**

In accordance with the provisions of IDEA and its implementing regulations:

1.  The District may report a crime committed by a child with a disability to appropriate authorities, and such action will not constitute a change of the student's placement.

2.  The Superintendent shall ensure that copies of the special education and disciplinary records of a student with disabilities are transmitted for consideration to the appropriate authorities to whom a crime is reported.

## CORPORAL PUNISHMENT/EMERGENCY INTERVENTIONS

Corporal punishment is any act of physical force upon a student for the purpose of disciplining that student. Any teacher, administrator, officer, employee or agent of the School District shall not use corporal punishment as a means of discipline against a student; nor shall corporal punishment be used against a student by a parent or any other visitor while on school property.

However, in situations where alternative procedures and methods that do not involve the use of physical force cannot reasonably be used, then the use of reasonable physical force may be used to:

1.  Protect oneself from physical injury;

2.  Protect another student, teacher or any other person from physical injury;

3.  Protect the property of the school or others; or

4.  Restrain or remove a disruptive student, whose behavior interferes with the orderly exercise and performance of School District functions, powers and duties, if that student has refused to comply with a request to refrain from further disruptive behavior.

Such emergency interventions shall only be used in situations where alternative procedures and methods not involving the use of reasonable physical force cannot reasonably be employed. Emergency interventions shall not be used as a punishment or as a substitute for systematic behavioral interventions that are designed to change, replace, modify or eliminate a targeted behavior.

In situations when a school employee uses physical force against a student, the school employee shall, make an immediate verbal report of the situation to the Building Principal or Supervisor/designee with the written report to follow within forty-eight (48) hours. The Building Principal or Supervisor/designee shall, within the same school day, make an immediate verbal report to the Superintendent/designee describing in detail the circumstances and the nature of the action taken with the written report to follow within forty-eight (48) hours.

The School District will maintain documentation on the use of emergency interventions for each student including:

a)  Name and date of birth of student;

b)  Setting, location, date and time of the incident;

c)  Name of staff or other persons involved;

d) Description of the incident and emergency intervention used, including duration;

e) A statement as to whether the student has a current behavioral intervention plan; and

f) Details of any injuries sustained by the student or others, including staff, as a result of the incident.

This documentation will be reviewed by School District supervisory personnel and, if necessary, by the school nurse or other medical personnel.

The District will file all complaints about the use of corporal punishment with the Commissioner of Education in accordance with the Commissioner's Regulations.

## STUDENT SEARCHES AND INTERROGATIONS

### Questioning of Students by School Officials

Any school designee authorized to impose a disciplinary penalty on a student may question a student about an alleged violation of law, school rules or the District Code of Conduct. School officials are not required to give a "Miranda" type warning before questioning, nor are school officials required to contact a student's parent before questioning the student. However, school officials will tell all students why they are being questioned.

School officials have the right and responsibility to contact appropriate law enforcement agencies, as may be necessary, with regard to statements and information given by students to school officials.

### Student Searches by School Officials

In order to maintain discipline and safety on school property and at school functions, students and their property, as well as desks, lockers, and other school property used by students, may be subject to searches by authorized school officials. However, the constitutional right of students to be free from unreasonable searches and seizures shall be protected.

The Superintendent, building administrators, school nurse, and District security officials are authorized to conduct searches of students and their belongings on school grounds if the authorized school official has reasonable suspicion to believe that the search will result in evidence that the student violated the law, school rules, or the District Code of Conduct.

An authorized school official may conduct a search of a student's belongings that is minimally intrusive, such as touching the outside of a book bag, without reasonable suspicion, so long as the school official has a legitimate reason for the very limited search.

Before searching a student or the student's belongings, the authorized school official should attempt to obtain the student's admission that he or she possesses physical evidence that they violated the law or the District Code, or get the student to voluntarily consent to the search. Searches will be limited to the extent necessary to locate the evidence sought.

Whenever practicable searches will be conducted in the privacy of administrative offices and students will be present when their possessions are being searched.

Factors that may be considered in determining whether reasonable cause exists to search a student include:

1. The age of the student;

2.  The student's record and past history;

3.  The predominance and seriousness of the problem in the school where the search is directed;

4.  The reliability of the information used as a justification for the search;

5.  The school official's prior knowledge of and experience with the student; and

6.  The urgency to conduct the search without delay.

**Student Lockers, Desks, Computers and Other School Storage Places**

The rules in this Code of Conduct regarding searches of students and their belongings do not apply to student lockers, desks, computers and other storage places. Students have no reasonable expectation of privacy with respect to these places and school officials retain complete control over them. This means that student lockers, desks, computers, including electronic storage and other storage may be subject to search at any time by school officials, without prior notice to students and without their consent.

**Other Searches**

Personal searches on school property or at a school function may occur in accordance with Board policy and law.

**Police Involvement in Searches and Interrogations**

The District is committed to cooperating with law enforcement authorities to maintain a safe school environment. Police officials may interview or search students in schools or at school functions, or to use school facilities in connection with police work, in accordance with law and Board policy.

**Child Protective Services Investigations**

Consistent with the District's commitment to keep students safe from harm and the obligation of school officials to report to child protective services when they have reasonable cause to suspect that a student has been abused or maltreated, the District will cooperate with local child protective services workers who wish to conduct interviews of students on school property relating to allegations of suspected child abuse, and/or neglect, or custody investigations.

## VISITORS TO THE SCHOOLS

The following rules apply to visitors to the schools:

1.  Anyone who is not a regular District staff member or student of the school will be considered a visitor.

2.  All visitors to the school must report to the main office upon arrival at the school and state the purpose of their visit. Visitors will be required to sign the visitors register and follow specific building procedures. Visitors are to immediately report to the area of their stated business and promptly leave the building when their business is completed. Signs notifying visitors to report first to the school office shall be prominently posted in each school building in the District.

3. Visitors attending school functions that are open to the public, such as parent-teacher organization meetings or public gatherings are not required to register.

4. Parents or citizens who wish to observe a classroom while school is in session are required to obtain permission in advance from the Building Principal.

5. Visitors are expected to refrain from taking class time to discuss individual matters with teachers.

   Visitation will occur in a way that avoids or minimizes disruption to the normal learning process and the ordinary classroom routine. The building administrator may accompany visitors during the visit when appropriate. Visitors are expected to maintain confidentiality regarding information acquired during the course of the visit.

6. Any unauthorized person on school property will be reported to the Principal or his or her designee. Unauthorized persons will be asked to leave. The police may be called if the situation warrants.

   Before a child may be released from the building with a visitor, must be approved by the Building Principal or designee as one having the legal right to take the child. The visitor will wait in the main office for the child to come from the classroom and/or follow other duly approved procedures for that building.

7. All visitors are expected to abide by the rules for public conduct on school property contained in this Code of Conduct.


## PUBLIC CONDUCT ON SCHOOL PROPERTY

The District is committed to providing an orderly, respectful environment that is conducive to learning. To create and maintain this kind of an environment, it is necessary to regulate public conduct on school property and at school functions. For purposes of this section of the Code, "public" shall mean all persons on school property or attending a school function including students, teachers and District personnel.

The restrictions on public conduct on school property and at school functions contained in this Code are not intended to limit freedom of speech or peaceful assembly. The District recognizes that free inquiry and free expression are indispensable to the objectives of the District. The purpose of this Code is to maintain public order and prevent abuse of the rights of others.

All persons on school property or attending a school function shall conduct themselves in a respectful and orderly manner. In addition, all persons on school property or attending a school function are expected to be properly attired for the purpose they are on school property.

### Prohibited Conduct

No person, either alone or with others, shall:

1. Intentionally injure any person or threaten to do so.

2. Intimidate, harass or discriminate against any person based on actual or perceived race; color; weight; national origin; ethnic group; religion or religious practice; disability; sexual orientation; gender, gender identity; or sex; by employees or students on school property or at a school-sponsored function.

3. Obstruct the free movement of any person in any place to which this Code applies.

4.  Willfully incite others to commit any of the acts prohibited by this Code.

5.  Intentionally damage or destroy School District property or the personal property of a teacher, administrator, other District employee or any person lawfully on school property, including graffiti or arson.

6.  Disrupt or prevent the orderly conduct of classes, school programs or other school functions.

7.  Distribute or wear apparel or other materials on school property or at school functions that are obscene, advocate the use of drugs, alcohol, tobacco products or illegal action, appear libelous, obstruct the rights of others, or are disruptive to the school program.

8.  Use tobacco products on school property or at any school function.

9.  Possess, consume, sell, distribute or exchange alcoholic beverages, tobacco, tobacco products, banned products, illegal and/or controlled substances, counterfeit and designer drugs, or paraphernalia for the use of such drugs or be under the influence of any such substances on school property or at a school function.

10. Possess or use weapons in school buildings or on school property or at a school function, except in the case of law enforcement officers on official business or except as specifically authorized by the School District. It is requested that law enforcement officers on official business notify the administration upon entering School District property.

11. Gamble on school property or at school functions.

12. Enter any portion of the school premises without authorization or remain in any building or facility after it is normally closed.

13. Loiter on or about school property.

14. Refuse to comply with any reasonable order of identifiable School District officials performing their duties.

15. Violate the traffic laws, parking regulations or other restrictions on vehicles, including the unauthorized operation of ATVs, snowmobiles and other such vehicles, as posted.

16. Violate any federal or state statute, local ordinance or Board policy while on school property or while at a school function.

**Penalties**

Persons who violate this Code shall be subject to the following penalties:

1.  Visitors. Their authorization, if any, to remain on school grounds or at the school function shall be withdrawn and they shall be directed to leave the premises. If they refuse to leave, they shall be subject to ejection and may not return. The duration of the eviction will be determined by the severity of the action and in accordance with law.

2.  Students. They shall be subject to disciplinary action as the facts may warrant, in accordance with the due process requirements.

3.  Tenured faculty members. They shall be subject to disciplinary action as the facts may warrant in accordance with Education Law Section 3020-a or any other legal rights that they may have.

4.  Staff members in the classified service of the civil service entitled to the protection of Civil Service Law Section 75. They shall be subject to immediate ejection and to disciplinary action as the facts may warrant in accordance with Civil Service Law Section 75 or any other legal rights that they may have.

5.  Staff members other than those described in Subdivisions 3 and 4. They shall be subject to warning, reprimand, suspension or dismissal as the facts may warrant in accordance with any legal rights they may have.

## Enforcement

The Building Principal or his or her designee shall be responsible for enforcing the conduct required by this Code.

When the Building Principal or his or her designee sees an individual engaged in prohibited conduct, which in his or her judgment does not pose any immediate threat of injury to persons or property, the Principal or his or her designee shall tell the individual that the conduct is prohibited and attempt to persuade the individual to stop. The Principal or his or her designee shall also warn the individual of the consequences for failing to stop. If the person refuses to stop engaging in the prohibited conduct, or if the person's conduct poses an immediate threat of injury to persons or property, the Principal or his or her designee shall have the individual removed immediately from school property or the school function. If necessary, local law enforcement authorities will be contacted to assist in removing the person.

The District shall initiate disciplinary action against any student or staff member, as appropriate, with the "Penalties" section above. In addition, the District reserves its right to pursue a civil or criminal legal action against any person violating the Code.

# DISSEMINATION AND REVIEW

## Dissemination of Code of Conduct

The Board will work to ensure that the community is aware of this Code of Conduct by:

1.  Conducting a public hearing relating to this Code before Board approval.

2.  Providing copies of a summary of the Code to all students, in an age-appropriate, plain-language version, at a general school assembly held at the beginning of each school year.

3.  Making copies of the Code available to all parents at the beginning of the school year.

4.  Providing a summary of the Code of Conduct written in plain language to all parents of District students before the beginning of each school year and making this summary available later upon request.

5.  Providing all current teachers and other staff members with a copy of the Code and a copy of any amendments to the Code as soon as practicable after adoption.

6.  Providing all new employees with a copy of the current Code of Conduct when they are first hired.

7.      Making copies of the Code available for review by students, parents and other community members.

The Board will support an in-service education program for all District staff members to ensure the effective implementation of the Code of Conduct. The Superintendent may solicit the recommendations of the District staff, particularly teachers and administrators, regarding in service programs pertaining to the management and discipline of students.

The Board of Education will review this Code of Conduct every year and update it as necessary. In conducting the review, the Board will consider how effective the Code's provisions have been and whether the Code has been applied fairly and consistently.

The Board may appoint an advisory committee to assist in reviewing the Code and the District's response to Code of Conduct violations. The committee will be made up of representatives of student, teacher, administrator, and parent organizations, school safety personnel and other school personnel.

Before adopting any revisions to the Code, the Board will hold at least one public hearing at which school personnel, parents, students and any other interested party may participate.

The District shall post the complete Code of Conduct (with all amendments and annual updates) on the District's website. The link to the District's posting will be requested annually by the New York State Education Department (NYSED) via the Uniform Violent Incident Reporting System (VADIR) and will serve as the submission to the Commissioner of Education.